# GROUP EXHIBIT A
## (FILED UNDER SEAL)

# EXHIBIT B
## (FILED UNDER SEAL)

# EXHIBIT C
## (FILED UNDER SEAL)

# EXHIBIT D
# (FILED UNDER SEAL)

# EXHIBIT E
## (FILED UNDER SEAL)

# EXHIBIT F
## (FILED UNDER SEAL)

# EXHIBIT G
# (FILED UNDER SEAL)

# EXHIBIT H
# (FILED UNDER SEAL)

# EXHIBIT I

PO Box 100569
Florence, SC  29502-0569

03-13-2009

Schulken, Jeffrey D
10415 Calvert Dr
Cupertino, CA 95014-3835

Loan Number Ending In:
*****9764

Additional Borrowers:
Schulken, Jenifer I

Property Address:     10415 Calvert Dr
                      Cupertino, CA 95014

Dear Customer:

Thank you for being a valued customer.

We need your help updating your financial information related to your Home Equity Line of Credit (HELOC). Your account documents allow us to request updated information from you.

Complying with our request is easy:

- Complete and sign the enclosed Internal Revenue Service (IRS) Form 4506-T where indicated for each Borrower shown above. Instructions for completing the form are on the following page. This form allows us to obtain a summary of a specified federal tax return from the IRS.
- Provide a copy of a recent paystub for each Borrower and any additional current income documentation you would like to provide. Please indicate if you are self employed.
- Return each completed and signed 4506-T and other documents within 14 days of the date of this letter. You can fax the documents to 1-866-272-9223 or mail them to: Washington Mutual Bank, a division of JPMorgan Chase Bank, N.A., Account Management MB0402FL, P.O. Box 3990, Melbourne, FL 32902-3990.

It is important that you provide this information. Thank you for your cooperation. If you have additional questions please contact us toll free at (877) 750-6825, Monday through Friday 5:00 a.m. to 6:00 p.m. and Saturday 5:00 a.m. to 2:00 p.m. Pacific Time. If you are a hearing impaired customer, please contact us at (800) 841-1743 (TDD), Monday through Friday 6:00 a.m. to 7:00 p.m. and Saturday 6:00 a.m. to 5:00 p.m. Pacific Time.

Sincerely,

Washington Mutual Bank, a division of
JPMorgan Chase Bank, N.A.

PO Box 100569
Florence, SC 29502-0569

## Answers to Frequently Asked Questions:

**Q:** You did not require income/financial information at the time of loan request. How can you require it now?
**A:** Your HELOC documents require you to provide updated information upon request.

**Q:** What is a 4506-T?
**A:** The 4506-T is an authorization to order a transcript, or summary, of the requested tax years from the IRS, and is a common form used in the mortgage industry. It is not a copy of the actual tax returns you filed.

**Q:** Can I just provide you my tax returns for the requested years vs. signing the 4506-T?
**A:** Unfortunately no. While you can provide any additional documentation that would support your current financial information, Chase/WaMu will still require you to complete and return the 4506-T.

## How to Complete the 4506-T:

1
### Provide your information:

| Line 1a: | Name shown on tax return. If you filed a joint return, enter the name shown first. |
| 1b: | First social security number on tax return. |

| Line 2a: | If a joint return enter spouse's name shown on return. |
| 2b: | Second social security number if joint tax return. |

| Line 3: | Current name, address, city, state and ZIP code. |

| Line 4: | Previous address shown on the last return filed if different from line 3. |

2
### Review the information we provided:

| Line 5: | The IRS will send the tax transcript to the address shown. |

| Line 6: | Transcript requested - We have selected 1040, since it is the most common form. If you file a different form or need an additional 4506-T, call us at 877-750-8825 and we will gladly assist you. |

| Line 6a: | Return Transcript - This allows us to receive a transcript of your most recent tax returns. |

| Line 9: | Year or period requested - We are requesting transcripts for the two most recent tax years. |

3
### Sign and date the form:

If a joint return, only one signature is required.

# EXHIBIT J
## (FILED UNDER SEAL)

# EXHIBIT K
## (FILED UNDER SEAL)

# EXHIBIT L
# (FILED UNDER SEAL)

# EXHIBIT M
## (FILED UNDER SEAL)

# EXHIBIT N
## (FILED UNDER SEAL)

# GROUP EXHIBIT O

# EXHIBIT O-1

Edelson McGuire, LLC

350 North LaSalle Street, Suite 1300, Chicago, Illinois 60654
t 312 589.6570 f 312 589.6378
www.edelson.com

May 9, 2011

### *Via Electronic Mail*

LeAnn Pederson Pope, Esq.
Victoria R. Collado, Esq.
Michael Salemi, Esq.
Burke, Warren, MacKay & Serritella, P.C.
330 N. Wabash Avenue, 22nd Floor
Chicago, Illinois 60611-3607

   **Re:   *Schulken v. Washington Mutual Bank and JPMorgan Chase Bank, N.A.,*
          Case No. 09-cv-2708 (N.D. Cal)**

Dear Counsel:

      This letter memorializes our conversations of Friday, May 6, 2011, regarding Plaintiffs'
pending Motion to Compel. As we stated at the conclusion of the last call, provided that Chase
agrees to the terms we discussed, and which we summarize below, Chase may represent to the
Court that the Parties have resolved the matters set forth in the Motion to Compel.

      1.     Sampling. As we discussed, Plaintiffs ultimately need to be able to show the
number of HELOC borrowers who had the Schulken HELOC Contract[1] who at any time since
September 2008 had their HELOC accounts blocked through the 4506-T Program based on
either "incompleteness" (a borrower's failure to return either the completed IRS Form 4506-T or
paystubs) (a.k.a "Incomplete Responders") or due to their failure to provide any response at all
(a.k.a. "Non-Responders") and the OTB saved through such suspensions.

      In its answers to Plaintiff's Third Set of Interrogatories, which Plaintiffs received on May
4, 2011, Chase has identified a population of 4,597[2] borrowers whose HELOCs were blocked at
any time based upon incompleteness. Chase has been unable to provide Plaintiffs with the
number and percent of these borrowers who had the Schulken HELOC Contract. Likewise,

---

[1]      The Schulken HELOC Contract refers to the form HELOC contract that applied first to
the Schulken's relationship with WaMu, and then subsequently their relationship with Chase
following the September 2008 acquisition, that stated the borrower was required to provide a
"current financial statement, new credit application, or both, at any time upon [the bank's]
request." For the sake of clarity, a borrower whose form HELOC contract had the same or
substantively similar language is considered to have "had the Schulken HELOC Contract" or is
"subject to the Schulken HELOC Contract."

[2]      Chase's responses to Plaintiff's Third Set of Interrogatories also identify 662 accounts for
which Chase's tracking system cannot currently provide the basis for the initial suspension.
These borrowers may include potential class members. Accordingly, in the event that the Court
requires a more definite answer regarding numerosity or should the Court certify any class, then
Chase agrees to perform the work necessary to ascertain from these 662 accounts how many and
what percent had the Schulken HELOC Contract and, of those, how many were putative or
actual class members.

Illinois/New York /California

Edelson McGuire, LLC

although Chase has identified the total number of borrowers who were blocked as "Non-Responders," Chase has also been unable to provide Plaintiffs with the number and percent of these borrowers who had the Schulken HELOC Contract.

As discussed, we believe a simple random sample ("SRS") of 200 of the 4,597 Incomplete Responders would provide Plaintiffs with a statistically relevant understanding of the number of and percent of such borrowers who had the Schulken HELOC Contract. Plaintiffs believe similar results could be obtained through an SRS with a sample size of 250 for the heritage WaMu accounts that were blocked as "Non-Responders."

These figures are unquestionably relevant. Plaintiffs are likely to seek Class Certification for up to three classes[3], defined substantially as follows:

a. Any and all borrowers who had the Schulken HELOC Contract whose HELOCs were blocked by Chase at any time from September 2008 to the present due to the borrowers' incomplete responses to requests by Chase that the borrowers return a completed IRS Form 4506-T or paystubs to Chase.

b. Any and all borrowers who had the Schulken HELOC Contract whose HELOCs were blocked by Chase at any time from September 2008 to the present due to the borrowers' failure to respond at all to a request by Chase that the borrower return a complete IRS Form 4506-T or paystubs to Chase.

c. Any and all heritage WaMu HELOC borrowers whose HELOC accounts were originated based upon stated income but were subsequently blocked by Chase at any time from September 2008 to the present through its 4506-T Program based upon Chase's determination that the borrowers' verified financial information demonstrated a material adverse change from the stated income on record at account origination.

For the purposes of Plaintiffs' anticipated Motion for Class Certification, Plaintiffs intend on demonstrating numerosity by providing the number of customers described in each class to the Court.

To avoid the effort and time involved in sampling of this nature, as we discussed on the telephone, Chase is willing to stipulate that Plaintiffs have satisfied their burden of showing that each of the above-defined three classes is sufficiently numerous such that joinder is impracticable for the purposes of Rule 23. Specifically, Chase stipulates and agrees that at least 100 borrowers fall into each of the above-defined classes. The Parties agree that numerosity for the above classes is not at issue, and Chase further agrees not to contest numerosity in its anticipated opposition to the Plaintiffs' to-be-filed Class Certification motion.

---

[3]     As stated on the call, Plaintiffs are confident that these are the classes for which certification will be sought in the forthcoming Motion for Class Certification and Motion for Leave to File an Amended Class Action Complaint. However, Plaintiffs reserve the right to refine these class definitions should further discovery demonstrate a need to do so.
Chicago/New York/California

Edelson McGuire, LLC

Chase agrees, consistent with any order from the Court granting Class Certification with respect to any of the putative classes, to provide to the Plaintiffs and the Court a list of all members of such class(es). This is without prejudice to Plaintiffs' ability to seek additional merits-based discovery.

Likewise, in the event that the Court deems this agreement insufficient or, prior to certification, indicates that a more precise answer regarding the number of HELOC borrowers who fall into any of the putative classes is required, Chase agrees to perform the sampling described above.

As a related matter, if Chase agrees to the terms set forth in this letter, the Deposition Notice for Mr. Larry Fells will be withdrawn, as his testimony was intended to be related to how Chase could determine the number, and the number itself, of Incomplete Responders and Non-Responders.

2.    Audit Report. Chase has agreed to provide the Action Plans mentioned in the February 26, 2010 Audit Report in advance of the deposition of Robert Resh, which is presently scheduled for May 25, 2011.

3.    Meeting Minutes. Chase represents that there are no Executive Committee meeting minutes in existence. Chase further represents that it is unaware of any other meeting minutes that Chase could produce that are relevant to this litigation.

4.    Email Search Terms. Chase agrees to work cooperatively with Plaintiffs to further develop and refine Plaintiffs' proposed email search terms and protocol for the purpose of obtaining all relevant emails. Chase agrees to engage in a meet and confer regarding the email production during the week of May 16th.

Thank you for working to constructively address these issues. We are available today to further discuss any of these issues.

Sincerely,

Evan M. Meyers

# EXHIBIT O-2

**From:** "Salemi, Michael G." <MSalemi@burkelaw.com>
**Date:** May 26, 2011 3:06:03 PM MDT
**To:** Evan Meyers <emeyers@edelson.com>, Steven Woodrow
<swoodrow@edelson.com>
**Cc:** Law Clerk Ben Thomassen <bthomassen@edelson.com>, "Pope, LeAnn
Pedersen" <LPOPE@burkelaw.com>, "Collado, Victoria R."
<VCollado@burkelaw.com>, "Sorge Smith, Tiffany L."
<TSorgeSmith@burkelaw.com>, <{F249718}.Active@emm.burkelaw.com>
**Subject: RE: Schulken v. Chase [IWOV-Active.FID249718]**

Evan and Steve—

Following up on your email below regarding the proposed class, Chase
would agree that the proposed class contains at least 100 members and
that numerosity is not at issue for the proposed class.

## Michael G. Salemi
**Burke, Warren, MacKay & Serritella, P.C.**
330 N. Wabash, 22nd Floor | Chicago, IL 60611
Phone 312.840.7112 | Fax 312.840.7900
msalemi@burkelaw.com | www.burkelaw.com | my profile

Confidentiality Note: This email message is for the sole use of the intended
recipient(s) and may contain confidential and privileged information. Any
unauthorized review, use, disclosure or distribution is strictly prohibited. If you are
not the intended recipient, contact the sender via reply email and destroy all copies of
the original message.

Circular 230 Disclosure: Any tax advice contained in this message was not intended
or written to be used, and cannot be used (i) by any taxpayer for the purpose of
avoiding any penalties that may be imposed on the taxpayer, or (ii) to promote,
market or recommend to another party any transaction or matter addressed herein.

**From:** Evan Meyers [mailto:emeyers@edelson.com]
**Sent:** Thursday, May 19, 2011 3:49 PM
**To:** Pope, LeAnn Pedersen; Collado, Victoria R.; Salemi, Michael G.; Sorge
Smith, Tiffany L.
**Cc:** Steven Woodrow; Law Clerk Ben Thomassen
**Subject:** Schulken v. Chase

Victoria and Mike,

As discussed during our call from earlier today, we are still in the

process of putting together our class certification brief, and we are thinking about combining two of the three class definitions that we previously identified to you and for which you previously agreed each contained at least 100 members. As you requested, below is a proposed new class definition in writing. Again, we're still in the process of putting together the brief and the class definitions, so we have not reached a conclusion as to our use or precise language of this class definition.

That being said, and as with the previous class definitions that we talked about, would you agree that the following class contains at least 100 members and that numerosity would be satisfied with respect to such a class:

"All HELOC customers nationwide who were parties to the Schulken HELOC Contract whose HELOCs were suspended by Chase at any time from September 2008 to the present through Chase's 4506-T Program in response to the customers' failure to provide either a completed IRS Form 4506-T, paystubs, or both."

Please let us know as soon as you get a chance. Thanks.

Evan

--
Evan M. Meyers | Edelson McGuire LLC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
1.312.572.7202 (direct) | 1.312.589.6370 (firm) | 1.312.589.6378 (fax)

emeyers@edelson.com | www.edelson.com


Please consider the environment before printing this e-mail

# EXHIBIT O-3

**From:** "Salemi, Michael G." <MSalemi@burkelaw.com>
**Date:** May 28, 2011 8:52:53 AM MDT
**To:** <swoodrow@edelson.com>
**Cc:** "Pope, LeAnn Pedersen" <LPOPE@burkelaw.com>, "Collado, Victoria R." <VCollado@burkelaw.com>
**Subject: Re: Schulken v. JPMorgan Chase Bank, N.A. -- DRAFT Joint Supplemental CMC Report [IWOV-Active.FID249718]**

Steven--

Chase will stipulate that there were at least 100 California customers with the "Schulken HELOC contract" who were blocked through the 4506-T Program as either incomplete or non-responders and that there were at least 100 heritage WaMu customers in California who were suspended based on Chase's review of verified income as compared with stated income at origination.

Michael G. Salemi
Burke, Warren, MacKay & Serritella, P.C.
22nd Floor
330 N. Wabash Ave.
Chicago, Illinois 60611-3607
Tel: 312-840-7000
Fax: 312-840-7900
Direct: 312-840-7112

CONFIDENTIALITY NOTE:
This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is strictly prohibited. If you are not the intended recipient, contact the sender via reply email and destroy all copies of the original message.

**From:** Steven Woodrow <swoodrow@edelson.com>
**To:** Salemi, Michael G.
**Sent:** Fri May 27 17:43:20 2011
**Subject**: Re: Schulken v. JPMorgan Chase Bank, N.A. -- DRAFT Joint Supplemental CMC Report [IWOV-Active.FID249718]

Haven't heard from you on the below. Please advise.

Steven Lezell Woodrow | Edelson McGuire LLC
999 18th Street, Suite 3000
Denver, Colorado 80202
1.303.357.4878 (direct) | 1.303.357.4877 (firm) | 1.312.589.6378 (fax)
swoodrow@edelson.com | www.edelson.com

Please note my last name and email have changed

þ Please consider the environment before printing this e-mail

CONFIDENTIALITY AND LIABILITY FOR MISUSE.

The information contained in this communication is the property of Edelson McGuire, LLC. It is confidential, may be attorney work product, attorney-client privileged or otherwise exempt from disclosure under applicable law, and is intended only for the use of the addressee(s). Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited. If you have received this communication in error, please notify Edelson McGuire, LLC immediately by return e-mail and destroy this communication and all copies thereof, including all attachments.
Pursuant to requirements related to practice before the U.S. Internal Revenue Service, any tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for purposes of (i) avoiding penalties imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another person any tax-related matter.

On May 26, 2011, at 3:02 PM, Salemi, Michael G. wrote:
Steven—

Regarding the proposal in your email below, we will consider it and get back to you tomorrow. I will be separately responding to Evan's email regarding Plaintiffs' prior inquiry on the proposed combined class.

## Michael G. Salemi
### Burke, Warren, MacKay & Serritella, P.C.
330 N. Wabash, 22nd Floor | Chicago, IL 60611
Phone 312.840.7112 | Fax 312.840.7900
msalemi@burkelaw.com | www.burkelaw.com | my profile

Confidentiality Note: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is strictly prohibited. If you are not the intended recipient, contact the sender via reply email and destroy all copies of the original message.

Circular 230 Disclosure: Any tax advice contained in this message was not intended or written to be used, and cannot be used (i) by any taxpayer for the purpose of avoiding any penalties that may be imposed on the taxpayer, or (ii) to promote, market or recommend to another party any transaction or matter addressed herein.

**From:** Steven Woodrow [mailto:swoodrow@edelson.com]
**Sent:** Thursday, May 26, 2011 1:02 PM
**To:** Salemi, Michael G.
**Cc:** sreis@edelson.com; Evan Meyers; Irina Slavina; Collado, Victoria R.; Sorge Smith, Tiffany L.; Pope, LeAnn Pedersen; Weickhardt, George G.; {F249718}.Active@emm.burkelaw.com
**Subject:** Re: Schulken v. JPMorgan Chase Bank, N.A. -- DRAFT Joint Supplemental CMC Report [IWOV-Active.FID249718]

Is Chase willing to concede there were at least 100 California customers with the Schulken HELOC contract who were blocked through the 4506-T Program as either incomplete or non-responders? Likewise, please let us know if Chase is willing to concede there were at least 100 former WaMu customers in California who were originated based upon stated income but were suspended using verified income?

Please let us know Chase's position on this when you get a moment, as well as the status of our prior inquiry into numerosity for a combined national class of incomplete and non-responders who had the Schulken HELOC Contract.

Many thanks,

-Steven

Steven Lezell Woodrow | Edelson McGuire LLC
999 18th Street, Suite 3000
Denver, Colorado 80202
1.303.357.4878 (direct) | 1.303.357.4877 (firm) | 1.312.589.6378 (fax)
swoodrow@edelson.com | www.edelson.com

Please note my last name and email have changed

þ  Please consider the environment before printing this e-mail

CONFIDENTIALITY AND LIABILITY FOR MISUSE.
The information contained in this communication is the property of Edelson McGuire, LLC. It is confidential, may be attorney work product, attorney-client privileged or otherwise exempt from disclosure under applicable law, and is intended only for the use of the addressee(s).
Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited. If you have received this communication in error, please notify Edelson McGuire, LLC immediately by return e-mail and destroy this communication and all copies thereof, including all attachments.
Pursuant to requirements related to practice before the U.S. Internal Revenue Service, any tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for purposes of (i) avoiding penalties imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another person any tax-related matter.

On May 26, 2011, at 11:56 AM, Salemi, Michael G. wrote:

Steven—

In light of the clarification plaintiffs provided regarding the class definitions, we have a tweak to our section regarding the class definitions. I will send you our further revisions shortly.

## Michael G. Salemi
**Burke, Warren, MacKay & Serritella, P.C.**
330 N. Wabash, 22nd Floor | Chicago, IL 60611
Phone 312.840.7112 | Fax 312.840.7900
msalemi@burkelaw.com | www.burkelaw.com | my profile

Confidentiality Note: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is strictly prohibited. If you are not the intended recipient, contact the sender via reply email and destroy all copies of the original message.

Circular 230 Disclosure: Any tax advice contained in this message was not intended or written to be used, and cannot be used (i) by any taxpayer for the purpose of avoiding any penalties that may be imposed on the taxpayer, or (ii) to promote, market or recommend to another party any transaction or matter addressed herein.

**From:** Steven Woodrow [mailto:swoodrow@edelson.com]
**Sent:** Thursday, May 26, 2011 11:27 AM
**To:** Salemi, Michael G.
**Cc:** sreis@edelson.com; Evan Meyers; Irina Slavina; Collado, Victoria R.; Sorge Smith, Tiffany L.; Pope, LeAnn Pedersen; Weickhardt, George G.; {F249718}.Active@emm.burkelaw.com
**Subject:** Re: Schulken v. JPMorgan Chase Bank, N.A. -- DRAFT Joint Supplemental CMC Report [IWOV-Active.FID249718]

Michael:

Our edits to the proposed Joint Statement attached. You may esign and file, unless you have further revisions.

Thank you for working to get this done.

-Steven

# EXHIBIT P
# (FILED UNDER SEAL)

# EXHIBIT Q

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

-oOo-

JEFFREY SCHULKEN AND JENIFER )
SCHULKEN, individually and on )
behalf of a class of similarly )
situated individuals, )
)
                Plaintiffs, )
) Case No.
  -vs- ) C5:09-cv-2708-LHK
)
WASHINGTON MUTUAL BANK and )
JPMORGAN CHASE BANK, N.A., )
)
             Defendants. )
_____)

DEPOSITION OF
JEFFREY SCHULKEN
Wednesday, May 4, 2011, 8:39 a.m.

REPORTED BY:

KAREN SCOTT, CRP, CSR

LICENSE NO. 4027

Page 2

1            BE IT REMEMBERED THAT, pursuant to the laws

2     pertaining to the taking and use of depositions, and

3     on Wednesday, May 4, 2011, commencing at the hour of

4     8:39 a.m. thereof, at ROPERS, MAJESKI, KOHN & BENTLEY,

5     50 West San Fernando Street, Suite 1400, San Jose,

6     California, before me, Karen Scott, a Certified

7     Shorthand Reporter of the State of California, there

8     personally appeared

9                       JEFFREY SCHULKEN,

10    called as a witness by the defendant JPMorgan Chase

11    Bank, N.A., who, being by me first duly

12    sworn/affirmed, was thereupon examined and testified

13    as is hereinafter set forth.

14                       -  -  -

15

16

17

18

19

20

21

22

23

24

25

```
1                        APPEARANCES

2

3    For the Plaintiffs:

4              EDELSEON McGUIRE, LLC

5              BY:   EVAN M. MEYERS, ESQ.

6              350 North LaSalle, Suite 1300

7              Chicago, Illinois 60654

8              312/589-6370

9              emeyers@edelson.com

10

11   For the Defendant JPMorgan Chase Bank, N.A.:

12             BURKE, WARREN, MacKAY & SERRITELLA, P.C.

13             BY:   MICHAEL G. SALEMI, ESQ.

14             22nd Floor, 330 North Wabash Avenue

15             Chicago, Illinois 60611

16             312/840-7112

17             msalemi@burkelaw.com.

18

19             ROPERS, MAJESKI, KOHN & BENTLEY

20             By: GEORGE G. WEICKHARDT, ESQ. (NOT PRESENT)

21             201 SPEAR STREET, SUITE 1000

22             SAN FRANCISCO, CALIFORNIA 94105

23             415/543-4800

24
               Also present:  Arin Kerhoulas, Videographer,
25                             I-Witness Video
```

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

-oOo-

JEFFREY SCHULKEN AND JENIFER          )
SCHULKEN, individually and on         )
behalf of a class of similarly        )
situated individuals,                 )
                                      )
                    Plaintiffs,       )
                                      )  Case No.
    -vs-                               )  C5:09-cv-2708-LHK
                                      )
WASHINGTON MUTUAL BANK and            )
JPMORGAN CHASE BANK, N.A.,            )
                                      )
                    Defendants.       )
_____)

DEPOSITION OF
JEFFREY SCHULKEN
Wednesday, May 4, 2011, 8:39 a.m.

REPORTED BY:

KAREN SCOTT, CRP, CSR

LICENSE NO. 4027

JEFFREY SCHULKEN   5/4/2011

Page 26

1        A     I worked -- I was a customer service rep at   08:58:02

2   State Farm Insurance, an agent's office.

3        Q     Did you work with someone at State Farm, a

4   loan officer, for example, to apply for that line of

5   credit?                                                08:58:26

6        A     With State Farm Bank.

7        Q     Was there a particular person that you

8   worked with?

9        A     I don't recall.

10        Q     Did you have a particular purpose in mind    08:58:39

11   when you were entering -- when you were looking for

12   the State Farm line of credit?

13        A     Yes.  We wanted to remodel our house.

14        Q     Did you have plans in your mind about what

15   you wanted to do for the remodeling?                   08:58:56

16        A     We wanted to add a family room.

17        Q     Any other things that you had in mind for

18   remodeling when you were looking at the State Farm

19   loan?

20        A     Not when we initially took it out, no.  We   08:59:08

21   just wanted a family room.

22        Q     After you initially took it out, did you

23   have any other purposes in mind for which you were

24   going to use the State Farm line of credit?

25        A     Yes.                                         08:59:25

Page 27

| | |
|---|---|
| 1    Q    What were those purposes? | 08:59:26 |
| 2    A    We decided after we went through the | |
| 3    addition that the rest of the house needed extensive | |
| 4    renovation as well.  So we remodeled the rest of the | |
| 5    house and added a second bathroom.  A master bathroom. | 08:59:37 |
| 6    Q    When -- so just to clarify, it sounds like | |
| 7    after you entered into the State Farm line of credit, | |
| 8    you added family room; is that correct? | |
| 9    A    That's correct. | |
| 10    Q    And then after you added the family room, | 08:59:55 |
| 11    you decided to do further renovations? | |
| 12    A    That's correct. | |
| 13    Q    Can you estimate for me when you completed | |
| 14    the family room? | |
| 15    A    December of 2004, I believe it was. | 09:00:07 |
| 16    Q    Can you estimate for me when you closed on | |
| 17    the State Farm line of credit? | |
| 18    A    I don't recall.  Probably 2002, but I don't | |
| 19    recall for sure. | |
| 20    Q    And after you entered into the State Farm | 09:00:27 |
| 21    line of credit, did you spend, you know, a year and a | |
| 22    half or two years, approximately, adding the family | |
| 23    room or did it take less time than that? | |
| 24    A    It was only about maybe four or five months | |
| 25    total, if I -- it was probably less than that.  It was | 09:00:44 |

Page 28

| | | | |
|---|---|---|---|
| 1 | less than five months. | | 09:00:47 |

1    less than five months.                                    09:00:47

2         Q    To complete the addition?

3         A    Correct, which included rebuilding the back

4    of our house, our two children's bedrooms as well.

5         Q    Actually backing up a little bit, I'd like    09:01:16

6    to ask you some questions about your employment

7    history.

8         A    Uh-huh.

9         Q    Can you tell me where you are currently

10   employed?                                                 09:01:25

11        A    Self-employed.  My wife and I have a family

12   child care.

13        Q    What is the name of that child care?

14        A    Wee Ones Family Child Care.

15        Q    Is that two Es for the "Wee"?                  09:01:34

16        A    That is.

17        Q    Okay.  How long have you been self-employed

18   working at Wee Ones?

19        A    Myself, about four and a half years.  Just

20   over four and a half years.                              09:01:43

21        Q    Would that put you in about 2006 when you

22   started?

23        A    October 2006.

24        Q    Prior to -- and actually, can you tell me

25   what kind of corporate structure Wee One has -- Wee     09:02:05

Page 32

1    worked for a center.                                          09:05:53

2        Q    When did -- well, how did Wee Ones come

3    about?  Did both of you open it or did Jenifer open

4    it?

5        A    She opened it.                                       09:06:07

6        Q    When did Jenifer open Wee Ones?

7        A    I believe it was 2000.  She was pregnant

8    with our daughter, first -- Emily.  Wanted to be a

9    stay-at-home mom.

10       Q    Has Wee Ones always been operated out of the 09:06:27

11   Calvert Drive property?

12       A    Yes.

13       Q    So from approximately 2000, when it was

14   opened, through today, Wee Ones has operated there?

15       A    Yes.                                                 09:06:38

16       Q    From approximately 2000, when Jenifer

17   started it, through approximately October 2006, when

18   you started working with Wee Ones, were there any

19   other employees?

20       A    No.                                                  09:06:56

21       Q    Has it always been just you and just

22   Jenifer?

23       A    Yes.  The only time -- well, the -- we never

24   had employees, but Jenifer, her appendix burst, and so

25   we hired a helper for a couple of weeks to help her,  09:07:08

JEFFREY SCHULKEN   5/4/2011

Page 33

1   but it was through an agency.  It was a temporary.    09:07:11

2        Q     Okay.  With that digression done, I'll go

3   back to the State Farm HELOC that you --

4              Backing up a little bit further, when I say

5   HELOC, do you understand what I am talking about?    09:07:39

6        A     Yes, I do.

7        Q     Is that a home equity line of credit?

8        A     Yes.

9        Q     And regarding the State Farm HELOC, it

10  sounded like you entered into the HELOC in 2002 to add 09:07:48

11  a family room and then you -- afterwards you decided

12  to do some additional renovations as well.

13       A     No.  We didn't do the renovations until

14  2004.  So I had a HELOC with another bank -- I think

15  it was Wells Fargo -- for other things.  Like I bought 09:08:07

16  a Harley-Davidson with it, if I remember correctly.

17  Then I moved it to State Farm Bank for a favorable

18  interest rate, and then when we decided to add on to

19  the house, we utilized the existing State Farm HELOC

20  that we had.                                          09:08:25

21       Q     Okay.  So the family room that you added on,

22  do you recall whether that was done before or after

23  the State Farm HELOC?

24       A     It was done with the State Farm HELOC.

25       Q     With the State Farm HELOC?                 09:08:36

JEFFREY SCHULKEN   5/4/2011

Page 34

```
 1      A     That's correct.                            09:08:38

 2      Q     And that would have been completed in -- you

 3   said, I think, December 2004; is that correct?

 4      A     Yes.

 5      Q     At that point in time you were operating Wee 09:08:48

 6   Ones out of the property?

 7      A     That's correct.

 8            MR. MEYERS:   I was going to say object.  You

 9   mean we as in it was being operated or do you mean

10   Mr. Schulken?                                        09:09:00

11            THE WITNESS:   I wasn't operating it.  Just

12   Jenifer.

13   BY MR. SALEMI:

14      Q     At that point in time Wee Ones was operated

15   out of the property?                                09:09:06

16      A     Correct.  By Jenifer.

17      Q     And so after December 2004, did you and

18   Jenifer decide to make further renovations?

19      A     Yes.

20      Q     Can you tell me what further renovations you 09:09:22

21   wanted to do?

22      A     We added a master bathroom and enlarged the

23   master bedroom, remodeled the kitchen, replaced the

24   electrical a hundred percent, replaced the plumbing a

25   hundred percent, replaced a hundred percent of the   09:09:40
```

Page 35

1    windows, 100 percent of the siding, insulated the       09:09:44

2    whole house, put new carpet and flooring in.   The

3    house was 60 years old.  It needed it.

4         Q    It was time?

5         A    It was way overdue.  We realized that once     09:10:04

6    we opened up the back of the house to add the family

7    room.  It was terrible.

8         Q    I think now it makes sense to talk about the

9    property and how it's configured, both before the

10   family room addition, after the family room addition     09:10:25

11   and then after the further renovations you made.

12        A    Okay.

13        Q    Before the December 2004 addition of the

14   family room, can you just sort of describe the

15   property for me, how many bedrooms and that kind of      09:10:38

16   thing?

17        A    It's a three -- it was a three-bedroom,

18   one-bath, with a detached garage.

19        Q    Any basement?

20        A    No.  No basement, no attic.                    09:10:51

21        Q    Was there -- obviously there was a kitchen?

22        A    Uh-huh.

23        Q    Is that yes?

24        A    Yes.

25        Q    Okay.  Was there a common area or a living     09:11:04

Page 36

1    room?                                                   09:11:11

2        A    It was the living -- it was a living room,

3    dining room, family room, everything room.  It was the

4    main living area of the house, which isn't very big.

5        Q    We have -- probably we call it the front      09:11:23

6    room because --

7        A    There you go.  Front room.

8        Q    Exactly.

9        A    We eat, we sleep.  No, not sleep.

10       Q    So at that point in time prior to the        09:11:31

11   December 2004 addition of the family room, Wee Ones

12   was operated out of the property; is that right?

13       A    That's correct.

14       Q    Can you tell me whether there was a part of

15   the house that was primarily dedicated to Wee Ones?    09:11:46

16       A    It wasn't dedicated.  We used the whole

17   house.  We only had -- at the time I think Jenifer

18   only had three infants that she cared for, so they

19   didn't take up a whole lot of space.

20       Q    Why did you want to add a family room?        09:12:13

21       A    Because we had three kids all the time, once

22   we had our -- Kaylee was born, as well as my daughter

23   every other weekend, and we had -- we were falling

24   over each other.  There was not enough room.  The home

25   was just under a thousand square feet.  We were all    09:12:29

JEFFREY SCHULKEN   5/4/2011

Page 37

```
 1    sharing one bathroom, the six of us.  It was just too  09:12:34
 2    small.
 3        Q    Because Wee Ones was operated on the
 4    property, was that a factor that contributed to
 5    wanting the family room?                               09:12:58
 6        A    No.  The kids needed room to play.  Both
 7    their bedrooms were very small.  We had the three
 8    girls sharing one bedroom and my son in the other
 9    room.  It just wasn't enough room for toys, play, TV.
10        Q    And when you said earlier that prior to the  09:13:20
11    addition of the family room Wee Ones would just
12    basically use the whole house, can you tell me what
13    you mean by that?
14        A    Well, we just had the two bedrooms, the
15    girls' bedroom -- the girls' bedroom and my son's      09:13:32
16    bedroom.  So the infants would sleep in there.  When
17    they were awake, they would play on the floor in the
18    living room.  Infants --
19             Do you have children?
20        Q    Three of them.                                09:13:46
21        A    They don't do a whole lot when they're
22    infants.
23        Q    Then when they get bigger, they do a whole
24    lot.
25        A    She only did infant child care at that        09:13:53
```

Page 39

1    talking about doing the further renovations after the    09:15:01

2    addition of the family room, how many infants did

3    Jenifer typically have for Wee Ones?

4        A    The same.  Three.

5        Q    When you did the renovations that you just    09:15:22

6    sort of listed out, did you add any more living space

7    to the property?

8        A    Well, other than the family room, we added

9    about a hundred square feet for the master bedroom,

10   which included the bathroom.  The bathroom made about    09:15:34

11   half of that up.

12       Q    When you say "other than the family room,"

13   that was the first project that you completed?

14       A    The first thing was the family room, and the

15   only other thing was moving the wall of the master    09:15:45

16   bedroom out to accommodate a bathroom and a closet.

17       Q    Did you say it was about a hundred square

18   feet?

19       A    Yeah.  It wasn't a lot.  It wasn't a lot.

20   It was all the city would allow, 100 square feet.    09:15:59

21       Q    Do you recall whether or not there was ever

22   any discussion about adding or using, renovating --

23   let me strike that.

24            At this point in time, do you recall whether

25   there was any discussion about using a playroom in    09:16:20

Page 41

1       Q    Can you tell me if you did anything else    09:17:42

2    with -- using your State Farm line of credit?

3       A    Bought a Harley-Davidson and a Ford van.

4       Q    You mentioned earlier a Harley-Davidson that

5    I think you may have bought through Wells Fargo.    09:18:00

6       A    That was -- the second Harley-Davidson was

7    through State Farm.

8       Q    Okay.  And a Ford van you bought?

9       A    Ford van.

10      Q    What kind of van was that?                  09:18:18

11      A    That's a 15-passenger van.

12      Q    Do you still own that van?

13      A    Yes, we do.

14      Q    When you say "15-passenger," it

15   theoretically seats 15 people?                      09:18:27

16      A    It's configured to seat 11.  We don't use

17   the backseat.  We never have.  When we brought it home

18   from the car lot, we it took out and haven't put it

19   back in since.

20      Q    So how many rows does it have?              09:18:40

21      A    It's got three rows besides the driver and

22   passenger seat.

23      Q    Why did you buy the van?

24      A    We had a Dodge Caravan, and during the

25   summers with our four kids all there, the Caravan had  09:19:03

Page 42

|   |   |   |
|---|---|---|
| 1 | an air bag, so we could only fit our four kids in | 09:19:08 |
| 2 | there.  With car seats it was a little bit crowded. | |
| 3 | If Jenifer wanted to take the day-care kids to the | |
| 4 | park or to the library, you know, to the water | |
| 5 | fountain, she couldn't because it just wasn't big | 09:19:20 |
| 6 | enough.  We couldn't fit, let's see, five car seats | |
| 7 | and then two kids in boosters in a Dodge Caravan.  It | |
| 8 | just wasn't big enough.  So my wife was stuck at home | |
| 9 | for the whole summer when the kids -- our kids were | |
| 10 | out of school. | 09:19:38 |
| 11 | Q    When you say five car seats, that would be | |
| 12 | three infants through Wee Ones? | |
| 13 | A    Three infants, our two young kids, plus our | |
| 14 | two other kids needed boosters, so five car seats, two | |
| 15 | boosters just don't fit in a Caravan. | 09:19:50 |
| 16 | Q    Do you still own that Ford van? | |
| 17 | A    We sure do. | |
| 18 | Q    Has -- when did you purchase that -- strike | |
| 19 | that. | |
| 20 | When did you purchase the Ford van? | 09:20:05 |
| 21 | A    I believe it was 2003, if I remember | |
| 22 | correctly. | |
| 23 | Q    Do you have any other car or automobile? | |
| 24 | A    At the time we had a Toyota pickup, which | |
| 25 | has just been replaced last month with another Toyota | 09:20:32 |

Page 43

1    pickup.  The van is our primary family vehicle.        09:20:35

2        Q   So at the time you had a Toyota pickup, so

3    that was approximately 2003?

4        A   Yes.

5        Q   And --                                          09:20:49

6        A   Yeah.  Go ahead.

7        Q   Okay.  And then --

8        A   I was going to say, I had the truck from

9    1991 until 2011.  I've always had a truck.

10       Q   And now it's gone?                               09:20:59

11       A   It's gone.

12       Q   Did you -- were you the primary person who

13   used the Toyota pickup?

14       A   Yes.

15       Q   Has that always been the case in the last       09:21:07

16   ten years regardless of which pickup it was?

17       A   Yeah, pretty much.  You know, we share both

18   vehicles, but --

19       Q   Does the Toyota pickup -- does it have any

20   room for car seats?                                      09:21:21

21       A   Not for car seats.  It just has -- it's an

22   extra cab.  It's got a little jump seat, but not car

23   seats to put boosters on.

24       Q   Have you ever used the Toyota pickup -- you

25   personally, have you ever used the Toyota pickup in      09:21:34

Page 47

1    income tax appointment each year, I handle all the       09:26:03

2    finances.

3    BY MR. SALEMI:

4        Q    By the way, it's exactly the reverse in my

5    house, so --                                              09:26:14

6        A    Is it really?

7        Q    Has that changed over time or have you

8    always handled all of the finances?

9        A    Jenifer used to handle the finances.  I took

10   that over about 12 years ago.  About 2000.  I found       09:26:30

11   she wasn't balancing the checkbook.

12       Q    Okay.  When you were -- backing up to when

13   you were entering into the State Farm HELOC, did you

14   look at any other lenders to see whether or not there

15   were other HELOCs that you might be interested in?        09:27:10

16       A    No.

17       Q    Was that because you were working at State

18   Farm?

19       A    Yes.

20       Q    And at some point in time did you decide to      09:27:19

21   pay off the State Farm HELOC?

22       A    Yes.

23       Q    Can you tell me, first of all, when you

24   recall starting to think that maybe you wanted to pay

25   off the State Farm HELOC?                                 09:27:33

Page 48

1     A     I had a banking relationship with WaMu and     09:27:36
2  they offered a lower rate, lower interest rate.
3     Q     Do you recall when that was?
4     A     September of 2005, I believe.
5     Q     By that point you were no longer working at  09:28:00
6  State Farm; is that right?
7     A     That is correct.
8     Q     When you say you had a banking relationship
9  with WaMu, can you tell me what you mean by that?
10    A     Checking, savings, children's savings        09:28:20
11 accounts.
12    Q     And you say you had a banking relationship
13 and they offered you a lower interest rate?
14    A     That is correct.
15    Q     How did you learn about a -- about            09:28:46
16 potentially having a HELOC with WaMu?
17    A     The -- I believe it was the bank teller told
18 me about their rates.
19    Q     Is there a particular branch that you dealt
20 with or went to for WaMu?                               09:29:01
21    A     Yes.  Stevens Creek at Lawrence Expressway
22 branch.
23    Q     So you were -- you believe it was a teller
24 that told you about this?
25    A     A teller that originally solicited the        09:29:23

Page 50

1        Q    Can you tell me what the circumstances were? 09:30:39

2        A    The teller introduced me to her.  I sat at

3    her cubicle and we talked about it, and she took an

4    application in person on her computer.

5        Q    Was Jenifer present?                        09:31:00

6        A    No.

7        Q    When you say she took an application in

8    person on computer, what do you mean by that?

9        A    She asked questions and I answered them.

10       Q    Do you recall what those questions were?    09:31:39

11       A    Not exactly, no.

12       Q    Do you have a general recollection of what

13   those questions were?

14       A    Yeah.  I believe she was asking about how

15   much we wanted to borrow, what we wanted to do with   09:31:50

16   it.

17       Q    What did you tell her about how much you

18   wanted to borrow?

19       A    About a hundred thirty thousand.  That was

20   about the balance on the State Farm HELOC.            09:32:07

21       Q    What did you tell her about what you wanted

22   to do with it?

23       A    I told her we wanted to pay off the State

24   Farm HELOC.

25       Q    Did you tell her anything else about what    09:32:27

JEFFREY SCHULKEN   5/4/2011

|  | Page 51 |
|---|---|
| 1   you wanted to do with it? | 09:32:31 |

1   you wanted to do with it?

2        A    No.   That was the primary reason, just to

3   pay it off.   I just wanted to get a lower interest

4   rate.

5        Q    What else do you recall about the                09:32:49

6   conversation?

7        A    That was -- I don't recall anything really

8   more than that.   It was a standard application

9   conversation.   They seemed really eager to loan money.

10       Q    When you say it was a standard application     09:33:08

11   procedure, what do you mean by that?

12       A    It seemed to me, you know, where do you

13   live, how long have you lived there, where you work,

14   how much money do you owe, you know, for bills.

15       Q    Did you tell her where you lived, how long    09:33:28

16   you have lived there, how much money you owed?

17       A    Yes.

18       Q    Did you tell her where you worked?

19       A    Yes.

20       Q    What did you tell her about where you          09:33:36

21   worked?

22       A    That it was at that point Rodda Electric.

23       Q    Did she ask about where Jenifer worked?

24       A    Yes.

25       Q    What did you tell her about where Jenifer     09:33:44

Page 53

1      Q      Just if we could -- if you could let me          09:35:10
2    finish my question because I was about to say some
3    more.
4      A      Sorry.
5      Q      You say probably had a deposit slip.  Do you  09:35:18
6    recall having a deposit slip in your hand when you
7    were talking with Pham?
8      A      Not definitively, no.
9      Q      Do you recall showing her a deposit slip?
10     A      No.                                              09:35:29
11     Q      Do you recall her asking for a deposit slip?
12     A      No.
13     Q      Do you know whether the deposit slip that
14   you might have had in your hand was for Rodda Electric
15   or for Wee Ones?                                          09:35:47
16     A      No.
17     Q      Do you know whether or not you had a deposit
18   slip in your hand at the time?
19     A      Not definitively, no.  I just can't see why
20   I would have been in the branch otherwise.  That's       09:36:01
21   all.  The only reason I came in there was to deposit
22   funds into our accounts.  It wasn't like they had a
23   coffee bar.
24     Q      Any other -- any other thing about this
25   conversation with Pham that you can recall?              09:36:23

JEFFREY SCHULKEN   5/4/2011

Page 54

1    A    Pretty -- the thing that surprised me, she   09:36:27
2  seemed very eager to loan money.  I only wanted to pay
3  off the HELOC, and she said, oh, we can get you more
4  money.  You qualify for more, something like that.  I
5  was just kind of blown away because I didn't want   09:36:42
6  more.

7    Q    When you say she was eager to loan money,
8  what you are basing that on?

9    A    Well, we only wanted to borrow enough to pay
10  off State Farm and take advantage of their lower   09:36:53
11  interest rate.  Since we had a checking account, we
12  could get a reduced interest rate based on that
13  affiliation.  That's what our primary goal was, saving
14  interest, saving on the interest rate.

15    Q    And you think that she told you words to the 09:37:13
16  effect that you can qualify for more?

17    A    Yeah.

18    Q    Did she tell you how much more you could
19  qualify for?

20    A    After she entered all the information, she   09:37:22
21  told us 250,000.

22    Q    Did you see Pham actually entering in
23  information on her computer?

24    A    No.

25    Q    By that I mean, could you see the computer   09:37:38

JEFFREY SCHULKEN    5/4/2011

Page 55

1    screen?                                                09:37:40

2        A    No.

3        Q    Do you know what information she entered in?

4        A    No.

5        Q    So after she entered in the information, she 09:37:48

6    told you that you qualified for 250,000?

7        A    That's correct.  To the best of my

8    recollection, it was 250.

9        Q    Okay.  Did you want to borrow $250,000?

10       A    We didn't need to borrow 250,000.  She kind 09:38:06

11   of sold me on the idea that, hey, if you ever needed

12   it, you'd have it.

13       Q    At that time did you want to borrow

14   $250,000?

15       A    We didn't -- no.  We didn't need to.  We    09:38:26

16   just wanted to borrow enough to pay off State Farm.

17   Our goal was to pay off the loan.

18       Q    Did you tell Pham, no, I just want to pay

19   off the loan?

20       A    Well, I am sure I expressed that, but like I 09:38:39

21   said, she said, hey, you know, it doesn't cost -- if I

22   remember correctly, it won't cost you anything more.

23   The only time it will cost you is if you actually use

24   it.  So by having it, it won't cost you anything.

25   There is no additional fee, no additional cost.  And I 09:38:54

Page 56

1    fell for it.                                                     09:39:00

2        Q    When you say you fell for it, what do you

3    mean?

4        A    Because I didn't need it, so I did it

5    anyway.                                                          09:39:08

6        Q    So you didn't need anything above the

7    130,000?

8        A    That's correct.

9        Q    At that time do you recall providing any

10   documents to Pham?                                              09:39:36

11       A    No.

12       Q    At that time do you recall her asking for

13   any documents?

14       A    No.

15       Q    Did you keep any notes of that conversation? 09:39:49

16       A    No.

17       Q    Do you remember taking any notes?

18       A    No, I didn't.

19       Q    I think you mentioned that she had asked

20   about debt information.  Do you remember what you told 09:40:01

21   her?

22       A    Not exactly, but the only debt that we had

23   was in our credit cards and our first mortgage.  We

24   didn't have any car loans.

25       Q    I'm sorry.  We didn't have any --          09:40:14

Page 62

| | | |
|---|---|---|
1    this discussion with Pham, do you recall any                09:56:41

2    discussion about whether or not you could enter into a

3    business line of credit?

4         A    No.   Never.

5         Q    Since the Wee Ones is a sole                      09:56:52

6    proprietorship -- backing up, was Wee Ones a sole

7    proprietorship at the time?

8         A    Yes.

9         Q    Do you know whether it would have been

10   possible to enter into a business line of credit with  09:57:03

11   Wee Ones being the named borrower?

12        A    I do not, but that wasn't the intent of

13   getting the HELOC.  It was just to pay off the State

14   Farm HELOC.  There was no reason to get a business

15   line.  We didn't need one.                              09:57:17

16        Q    Do you recall any discussion about --

17        A    No.

18        Q    -- business lines of credit?

19        A    Sorry.  No.

20        Q    Okay.  I'm going to show you some documents, 09:57:24

21   and this will be -- start to remind you a little bit

22   about closing where you have documents to look at.

23        A    Okay.

24             MR. SALEMI:  Could you mark this, please.

25   And if we can do -- let's just start with Schulken 1   09:57:46

JEFFREY SCHULKEN   5/4/2011

Page 95

1      A    No.   Again, it was just to notarize our        10:37:30

2    signatures.

3      Q    Okay.   After the closing of the loan, sort

4    of in the immediate time period after the closing of

5    the loan, did you have any further communications with 10:37:43

6    people from WaMu regarding the HELOC?

7      A    Not that I recall, no.

8      Q    During this time frame, sort of at the

9    closing of the loan and before, do you know whether

10   Jenifer had any contacts with WaMu regarding the       10:38:06

11   HELOC?

12     A    Not that I know of, but it's unlikely.

13     Q    Do you know whether anybody else had

14   communications with WaMu regarding your HELOC during

15   this time frame?                                       10:38:19

16     A    No.

17     Q    At the time of the closing, did you

18   understand that the HELOC was going to be for

19   $250,000?

20     A    At the time of closing, yes.                    10:38:36

21     Q    And that it would pay off the remaining

22   balance of the State Farm HELOC?

23     A    Yes.

24     Q    At the time of the closing, did you have

25   plans about what you were going to use the additional  10:38:44

Page 96

1    line of credit for?                                      10:38:50

2         A    We weren't planning on using it at all.

3         Q    At some point in time did that plan change?

4         A    No, not really.

5         Q    At some point in time did you start using   10:39:01

6    the additional line or the additional amount in the

7    line?

8         A    Yeah.  Well, we didn't start using the

9    additional amount because what we had been doing is

10   paying it down.  If I remember -- I'm not positive,     10:39:10

11   but if I remember correctly, the total loan amount

12   never went above what we paid State Farm.

13          We started paying off the extra -- we paid

14   extra principal payments.  Almost immediately we

15   started paying that down.  In fact, in the week prior  10:39:24

16   to the freeze the loan amount was only $90,000.

17        Q    So after the closing of the loan, you began

18   paying down the principal amount?

19        A    Yeah.  When we could, yeah.  As far as I

20   recall.  It may have gone up a little bit.  We may     10:39:48

21   have used it.  I don't have the records in front of

22   me.

23        Q    Do you recall --

24        A    But it's not like we went out and added some

25   more stuff to the house or bought another car or       10:39:56

Page 106

1      our kids as well as Jenifer and myself and the          10:52:11

2      day-care kids.

3          Q    And the day-care kids.

4          A    So they're commingled.

5          Q    Well, I will ask Jenifer about that.          10:52:29

6      Actually, no.

7          A    I'm the one that buys the groceries.

8          Q    At that time, October/November of 2005, did

9      you -- you personally use the Chase Amazon Credit Card

10     to make any other purchases for what would be Wee Ones 10:52:43

11     expenses?

12         A    You know, I can't tell from looking at this

13     document specifically.

14         Q    As a general matter, though, would it be

15     fair to say that you did on occasion use the Amazon     10:52:58

16     Credit Card to make purchases for Wee Ones?

17         A    On occasion, yes, that would be fair to say,

18     but primarily this was used for personal.

19              If you will -- if I can expand on this.  If

20     you look at the Amazon.com point summary, which is in  10:53:11

21     the middle of the page, this is the reason we used

22     this credit card.  We charged every -- almost every

23     expense we had.  Whether it be gas or whether it be

24     Christmas presents for our own kids, birthday

25     presents, meals, home improvement stuff, we didn't pay 10:53:27

Page 107

1   cash.  We used the Amazon card because they gave us     10:53:30

2   lots of points, and then we just paid the bill off at

3   the end of the month.  So rather than using a lot of

4   ATM charges, we were trying to maximize our points,

5   which we got cash back from Chase.                      10:53:41

6        Q    Did you at that time, October/November 2005,

7   have a credit card that was dedicated to Wee Ones?

8        A    Never.  We've never had a business card.

9   The only card we've ever had is the one we used for

10  everything, you know.  We have had the Chase card, I    10:54:02

11  think, since, like I said 2004, if I remember

12  correctly.

13       Q    Okay.

14       A    I could look at my card and verify that if

15  you want.                                               10:54:12

16       Q    Well, no, it's fine.

17            And I won't go through this exercise for

18  every single transaction.

19       A    They're so varied, you know.  Like I said, I

20  didn't save receipts.  You know, it's like Aquarium     10:54:23

21  Garden.  We had seven aquariums in the house at the

22  time, you know.  Getzs, that was also -- that was a --

23  that was for aquariums, you know, so it was -- a lot

24  of that stuff was for our hobbies.

25       Q    On page Schulken 00294, there is a            10:54:44

JEFFREY SCHULKEN   5/4/2011

Page 120

1    was purchased; is that correct?                        11:17:34

2        A    That's correct.

3        Q    Can you tell me generally speaking what you

4    would use your Costco credit card for?

5        A    We buy a lot of meat there, groceries, some  11:17:42

6    cleaning supplies, but primarily stuff that we use

7    just for our family, not for the business.

8        Q    Has that changed over time?

9        A    No.  They've got great meat prices.  We buy

10   a lot of meat there.                                    11:18:01

11       Q    And you mentioned cleaning supplies.

12       A    Yes.  You know, we'll buy cleaning supplies

13   there on occasion.  Not every time, but on occasion

14   when we need them.

15       Q    Would those be cleaning supplies that would  11:18:14

16   be used for Wee Ones?

17       A    For the house, which is -- we use it mostly

18   to clean up our after our own kids, et cetera, but

19   some would be used, but not most.  Most are primarily

20   for our personal.                                       11:18:28

21       Q    I think the word you used before was

22   "commingled."  Is that accurate?

23       A    Commingled, but primarily for personal.

24   Same with the Amazon.  Even though we did buy some

25   things for business, it was primarily for personal.    11:18:40

JEFFREY SCHULKEN   5/4/2011

Page 121

1    It's very low cost to operate a child care.          11:18:43

2        Q    To determine the percentages of what you

3    used it for primarily versus business uses, we'd have

4    to go back and look at those purchases on the Costco

5    card; is that correct?                               11:19:00

6        A    Yes.

7        Q    Same thing with respect to the Amazon

8    purchases?

9        A    Yes.

10       Q    Sitting here today and looking at these,    11:19:04

11   this Costco bill, you can't determine what was

12   purchased or whether it was purchased for personal or

13   Wee Ones; is that correct?

14            MR. MEYERS:  I'll object to the form of the

15   question.                                            11:19:15

16            You can answer.

17            THE WITNESS:  Okay.  Yeah, you can't tell

18   from this, but I know, because I'm the one that does

19   all the purchasing there, that it's primarily used for

20   personal use.  You know, that's what we use it for.   11:19:23

21   We get incidentals that we use for child care.  If I

22   buy a big box of crackers, some of those are going to

23   go to the day-care kids, but the majority of them my

24   kids use for school lunches, et cetera.

25

Page 122

1   BY MR. SALEMI:                                               11:19:36

2       Q    Short of asking you to get in and testify

3   about what those purchases are for, we couldn't look

4   at this document and figure out what the purchase was

5   for; is that fair?                                          11:19:43

6       A    No, there is no way.  Again, other than

7   saying I know my shopping habits and what I buy there.

8   It's primarily personal.

9            MR. SALEMI:  Okay.  I think we're up to 12

10  at this point.                                              11:20:16

11           (Document referred to herein marked for

12           identification Exhibit No. 12)

13  BY MR. SALEMI:

14      Q    I have handed you what the court reporter

15  has marked as Schulken deposition Exhibit 12, and I'll   11:20:35

16  represent to you that this is a compilation of your --

17  some of the statements that you produced in this case

18  for your WaMu HELOC.

19      A    Okay.

20      Q    And I will kind of go further and say that    11:20:55

21  in reviewing Exhibit 7, which we talked about

22  earlier -- and I'll hand you what was previously

23  introduced as Exhibit 7.

24      A    Okay.

25      Q    I found a number of draws on the HELOC that   11:21:13

Page 134

1    with your HELOC from Chase or WaMu, depending on how   11:35:04

2    you view it?

3              MR. MEYERS:  Object.  What's the time frame

4    here?

5              MR. SALEMI:  After the failure.            11:35:13

6    September 25th, 2008 and going forward.

7              MR. MEYERS:  Same objection.  It's vague and

8    ambiguous as to what he is getting at.

9              You can answer if you understand.

10             THE WITNESS:  As far as I recall, the first  11:35:24

11   written correspondence asking anything is the letter

12   of March 13th asking for the 4506-T.

13             MR. SALEMI:  And you will hear that a lot.

14             If we could mark this as -- I think we're up

15   to 13.                                              11:35:42

16             (Document referred to herein marked for

17             identification Exhibit No. 13)

18   BY MR. SALEMI:

19   Q    I have handed you what the court reporter

20   has marked as Schulken Exhibit 13.  Could you take a  11:36:05

21   moment to look at that?

22        A    Uh-huh.

23             (Witness reviews document.)

24             THE WITNESS:  I have seen it many times.

25

Page 135

1    BY MR. SALEMI:                                          11:36:17

2        Q    What is this document?  Is this the

3    March 13th document that you just referred to?

4        A    Yes, it is.

5        Q    Just so the record is clear, that's           11:36:21

6    March 13th, 2009; is that correct?

7        A    That's correct.

8        Q    Can you tell me what this document is?

9        A    No.   I know -- I can tell you in my own

10   personal terms, but, you know, it was just them asking  11:36:32

11   for information for the 4506-T, but I couldn't

12   interpret it for you.

13       Q    Did you receive this document?

14       A    Yes, I did.

15       Q    Do you know when you received this document?  11:36:42

16       A    About the 17th or 18th.

17       Q    Of March?

18       A    Of March.

19       Q    2009?

20       A    2009.                                          11:36:50

21       Q    When you received this document, what did

22   you do?

23       A    I received it in the mail.  Within about an

24   hour of receiving it, I signed the 4506-T.  My wife

25   signed it, circled self-employed and faxed it back to   11:37:10

Page 136

1    the number.  We did it immediately.                    11:37:16

2         Q    Was there a form 4506-T enclosed?

3         A    Yes, there was.  If I recall, yes, there

4    was.

5         Q    And what number did you fax it to?  Is it    11:37:38

6    the number indicated on the document?

7         A    As far as I recall, yes.

8         Q    There is handwriting on this document.  On

9    the right it says 2008 -- well, why don't you tell me

10   what it says on the right.                             11:38:01

11        A    Yes.  2008 Schedule Cs and 1040.

12        Q    Is that your handwriting?

13        A    Yes, it is.

14        Q    Can you tell me what that means?

15        A    That was -- if I remember correctly, that    11:38:10

16   was a follow-up, what I sent them.  I can't recall if

17   I sent that the same day that I faxed the 4506-Ts.

18             Unfortunately, what this letter does not say

19   is if you are self-employed, this is what you need to

20   do.  It doesn't say that.  It just says please         11:38:31

21   indicate.

22        Q    And there is handwriting, additional

23   handwriting kind of below the body of the letter.  It

24   looks like it says "decrease line."

25        A    Yeah.  Correct.  "Per CSR - 'oops.'"  That   11:38:47

Page 138

```
 1   need these documents for your record.  That's all we   11:40:02
 2   need it for.

 3             May I continue?

 4             MR. MEYERS:  There is no -- why don't you

 5   wait until his question is pending.                     11:40:14

 6   BY MR. SALEMI:

 7       Q    Were you going to say something else?

 8       A    No, that's all right.

 9       Q    What were you going to say?

10       A    I'll just wait.  I was frustrated with the    11:40:22

11   whole process.  Let's leave it at that.  I was

12   frustrated.

13       Q    Did you include anything else with the

14   4506-T that you faxed in?

15       A    This -- as far as I remember, I faxed this    11:40:49

16   with it and I checked these off and I circled

17   self-employed.  I didn't -- it didn't say to write a

18   letter.  It didn't say to do anything.  You know, if

19   you are self-employed, so please indicate if you are

20   self-employed, I did it and I sent it back.            11:41:03

21       Q    When you say you did it, you mean you

22   circled it, please indicate if you are self-employed,

23   on this letter?

24       A    That's correct, yeah.

25       Q    That's what you faxed back?                    11:41:12
```

Page 139

| | | |
|---|---|---|
| 1 | A     Yes.   With the 4506-T. | 11:41:13 |
| 2 | Q     At that time when you received this, did you | |
| 3 | understand what a 4506-T was? | |
| 4 | A     I had never heard of it in my life.  And I | |
| 5 | can't -- I can't recall for sure.  I thought I sent | 11:41:29 |
| 6 | the Schedule Cs and the 1040 along with the 10 -- or | |
| 7 | the 4506-T, but I can't recall.  I can't say 99 -- I | |
| 8 | can't say a hundred percent sure, but I thought I had | |
| 9 | sent them, but it may have been on a future fax | |
| 10 | because I faxed stuff over and over for weeks and | 11:41:46 |
| 11 | weeks. | |
| 12 | Q     What are Schedule Cs to your understanding? | |
| 13 | A     That's the tax form, Schedule C, profit and | |
| 14 | loss from a business, if I remember -- if I remember | |
| 15 | correctly. | 11:42:00 |
| 16 | Q     And what is the 1040 to your understanding? | |
| 17 | A     That's the federal tax form 1040. | |
| 18 | Q     Okay.  So you fax it in.  Do you remember | |
| 19 | the date that you faxed it in? | |
| 20 | A     I do not, but I do have records of my fax | 11:42:18 |
| 21 | machine, the dates and times that everything was sent | |
| 22 | in. | |
| 23 | Q     Okay.  Do you remember the first telephone | |
| 24 | call you had regarding the -- this letter? | |
| 25 | A     It was the morning after I got this. | 11:42:33 |

Page 142

| | | |
|---|---|---|
| 1 | Q    When you say you were seeing things in the | 11:44:34 |
| 2 | media, is there anything in particular that you | |
| 3 | recall? | |
| 4 | A    No. | |
| 5 | Q    What is the next communication you recall | 11:44:43 |
| 6 | regarding the 4506-T request? | |
| 7 | A    If I remember correctly, it was when I | |
| 8 | looked online and saw that I had zero available | |
| 9 | balance.  I called again and then they said, oh -- it | |
| 10 | was like send this, send this, send that. | 11:45:03 |
| 11 | So I faxed numerous other documents, which | |
| 12 | is pretty much what happened over the next -- next | |
| 13 | week or so.  I kept -- they kept saying, oh, this, and | |
| 14 | I would.  Oh, send this; I would. | |
| 15 | Q    Back -- I'm sorry.  Go ahead. | 11:45:20 |
| 16 | A    And the thing -- pay stubs kept coming up, | |
| 17 | and it was like we're self-employed.  We don't have | |
| 18 | pay stubs.  Oh, no, you need to send pay stubs.  We | |
| 19 | don't have pay stubs.  We're self-employed. | |
| 20 | Q    Okay.  Backing up just to this Exhibit 13, | 11:45:33 |
| 21 | on the second page, which is Bates labeled Schulken | |
| 22 | 01012, there are some answers to frequently asked | |
| 23 | questions. | |
| 24 | Did you review that second page when you | |
| 25 | received this document? | 11:45:49 |

JEFFREY SCHULKEN   5/4/2011

Page 144

1       Q       And then you said you looked online and saw    11:47:28
2   there was a zero available balance.  Can you tell me
3.  when you looked online?
4       A       The day after I talked to Mary.
5       Q       Okay.  And then it sounds like you had some    11:47:36
6   additional phone calls; is that correct?
7       A       Yes.
8       Q       Tell me what you remember about those phone
9   calls starting at that point when there was a zero
10  available balance reflected on your online account.    11:47:46
11      A       You know, I don't remember the specifics
12  right offhand.  There were notes that I had included
13  with all -- you have copies of those, I believe, of
14  those conversations, but it was -- basically I was
15  trying to get the line reinstated.                     11:48:01
16      Q       Actually, why not?  Would those notes help
17  you refresh your recollection --
18      A       Totally.  Oh, yeah, because --
19      Q       If you could let me finish.
20              Will the notes help you refresh your          11:48:16
21  recollection as to the calls that you made after
22  receiving that letter?
23      A       Yes.
24              MR. SALEMI:  Okay.  Let's go ahead and mark
25  this as 14, please.                                    11:48:25

JEFFREY SCHULKEN   5/4/2011

Page 148

1    Q    Okay.  But it doesn't sound like you recall   11:51:27
2   anything about that initial call after the zero
3   balance; is that fair?
4    A    I'm sorry.  Say it again.
5    Q    It doesn't sound like you recall any         11:51:37
6   particulars about the call that you made after you saw
7   that there was a zero available balance on your online
8   account.
9    A    I don't recall, but I know I made phone
10  calls.                                              11:51:48
11    Q    Okay.  Anything that you can tell me about
12  those phone calls that you made after you saw the zero
13  available balance?
14    A    No, not that I recall.  Like I can just --
15  if you look at the fax history, I was still faxing    11:51:59
16  documents before that first date of 3/27.  I faxed 13
17  pages on the 19th, eight pages on the 21st, 22 more
18  pages on the 21st, and then 23 more pages on the 21st.
19    Q    Okay.
20    A    Again, like I said, at the time I didn't --   11:52:21
21  I probably didn't think it was necessary to write down
22  every person I talked to, who I talked to, when I
23  talked to.
24    Q    Did you receive more correspondence
25  regarding your WaMu HELOC?                           11:52:35

1         Q     Do you recall the date that you noticed that 11:53:45

2    the equity line had been frozen?

3         A     That would have been the -- I'm guessing the

4    morning of the 19th.

5         Q     When you say you are guessing, what are you  11:53:58

6    basing that on?

7         A     Based on I talked to Mary the 18th and it

8    was still available, so I believe it was -- if I

9    remember correctly, it was the following morning.

10        Q     And just so it's clear, you were referring  11:54:09

11   to the document that was previously marked as Schulken

12   Exhibit 14?

13        A     That is correct.

14        Q     What did you do when you received this

15   letter, Exhibit 15?                                    11:54:25

16        A     I would imagine I called again, but I don't

17   recall specifically.  I am -- I already knew it was

18   frozen, so --

19        Q     Do you remember whether you --

20        A     I -- let's see.  If this -- this is          11:54:49

21   probably -- just based on the dates, I'm just -- I'm

22   trying to rebuild this.  This is dated the 18th.  I

23   received it after that.  I faxed 50 -- 45 more

24   documents -- or actually 53 more documents on

25   March 21st.                                            11:55:09

Page 151

1           So I'd be willing to bet I received this          11:55:11

2    letter on March 21st.  I had it underlined here or

3    there.  The primary reason for the suspension is we

4    are unable to verify your income is sufficient to

5    satisfy your debt.  So that's when I started sending,  11:55:22

6    you know, deposits, taxes, whatever they told me they

7    needed.  Whatever hoop they asked me to jump through,

8    I jumped through.

9         Q    Was there ever a point where you received a

10   letter saying that your line was suspended because you 11:55:39

11   had failed to return the 4506-T?

12        A    I don't recall that I actually got a letter

13   saying that.  But I remember seeing -- you know, like

14   this one here, it's the same thing.  A signed 4506-T

15   and the most current pay stubs.                        11:56:01

16           They kept grouping the two together for some

17   reason.  Even when I talked to them on the phone, they

18   couldn't separate the two.  Well, no, you have to have

19   pay stubs.  I don't have pay stubs.  I'm

20   self-employed.  Well, no, you have to have pay stubs.  11:56:13

21        Q    Did you ever receive a letter saying that

22   your line was suspended because you had failed to

23   return any information at all?

24        A    I don't recall.  You have copies of all the

25   letters I received.  This is the first of three, if I  11:56:28

Page 164

1    BY MR. SALEMI:                                          12:17:55

2        Q    I have handed you what the court reporter

3    has marked as deposition Exhibit 18.  Could you take a

4    moment to look at that, please.

5             (Witness reviews document.)                    12:18:04

6    BY MR. SALEMI:

7        Q    Have you had a chance to review that

8    document?

9        A    Yes.  I have looked it over a little bit.

10       Q    Do you recognize that document?                12:18:47

11       A    Yes, I believe I do.

12       Q    What is that document?

13       A    Another letter from WaMu saying that the

14   primary reason for the suspension is that your income

15   does not appear to be sufficient to satisfy your debt, 12:19:00

16   which I will note -- having noticed is different from

17   the other letter that they sent.

18       Q    This letter is dated March 27th --

19       A    27th.

20       Q    -- 2009.  I'm sorry.  If you could -- if we   12:19:11

21   can try to avoid talking over each other.

22       A    I'm sorry.

23       Q    This letter is dated March 27th, 2009; is

24   that correct?

25       A    Yes.                                           12:19:22

JEFFREY SCHULKEN   ·5/4/2011

Page 165

1      Q    Is this -- well, this letter is dated after  12:19:24
2    the March 21st fax that we were just talking about; is
3    that correct?
4      A    Yes.
5      Q    What did you do when you received this        12:19:42
6    document?
7      A    I -- I don't recall exactly.  I assume I
8    called -- 3/27.  I made a phone call on the 31st of
9    March at 8:00.
10     Q    Actually, if you are referring to            12:20:10
11   Exhibit 14 --
12     A    Yes.
13     Q    -- which page are you referring to?
14     A    1037.
15     Q    Are you referring to the note at the top of  12:20:26
16   01037, the March 31st note?
17     A    Yes.  Yes, I am.  I'm assuming that's what
18   generated that call, was receiving this letter.
19     Q    Do you recall when you received the letter
20   that was marked Exhibit 18?                          12:20:40
21     A    I don't know the date.
22     Q    Do you recall calling in in response to this
23   letter?
24     A    I called many times and I called -- every
25   time I got a letter, I called.  Every time.          12:20:54

JEFFREY SCHULKEN   5/4/2011

Page 167

1      Q      But you were mentioning that on Exhibit 18    12:22:00

2    it gives you information about what to do if you

3    dispute the information.

4      A      Well, it has the FAQs.

5      Q      Is that what you were referring to?    12:22:22

6      A      Well, let me read them.

7      Q      Sure, no problem.

8      A      Sorry.

9             (Witness reviews document.)

10            THE WITNESS:  Yes.  This is on the one,    12:22:53

11   two -- it would be the fourth question down on

12   page 1016 of your document.  "What if I think you have

13   made this decision in error, how do I begin the appeal

14   process to have my line reinstated?"  Please call the

15   contact information on the previous page to request a    12:23:08

16   reinstatement.

17            And then I believe that's when Jessica

18   said -- she said that I didn't need to send in a

19   letter requesting reinstatement and I didn't have to

20   fax in, you know -- it was more or less, hey, we have    12:23:20

21   everything we need.

22   BY MR. SALEMI:

23     Q      Okay.  At that time, March 31st, did you

24   understand that Chase had all of the information it

25   needed in response to the inquiries it had made for    12:23:33

JEFFREY SCHULKEN   5/4/2011

Page 168

| | | |
|---|---|---|
| 1 | income information? | 12:23:37 |
| 2 | A    That's what she had stated. | |
| 3 | Q    Okay.  Tell me what happened next. | |
| 4 | A    Two hours and 15 minutes later she called | |
| 5 | back and said they would not unfreeze the HELOC.  She | 12:23:50 |
| 6 | said:  Due to income from average Schedule Cs, our | |
| 7 | income was too low compared to when we originally | |
| 8 | applied.  And that was before I knew about the | |
| 9 | inflated income on the application. | |
| 10 | Q    And just so the record is clear, you are -- | 12:24:06 |
| 11 | you were reading from Schulken Exhibit 14; is that | |
| 12 | correct? | |
| 13 | A    Yes, that's correct. | |
| 14 | Q    Just -- were you making -- these notes that | |
| 15 | are in Schulken Exhibit 14, were you making them at | 12:24:17 |
| 16 | the same time that you were having the conversations? | |
| 17 | A    As we were talking, I was jotting down, | |
| 18 | jotting down what we were talking about.  And then | |
| 19 | after I got off the phone, I actually wrote it all | |
| 20 | out.  I was just shorthand -- not shorthand, but | 12:24:30 |
| 21 | basically doing that. | |
| 22 | I didn't find out until April 2nd, when I | |
| 23 | called to talk to Jessica, because she never called me | |
| 24 | back -- she was supposed to call me back regarding -- | |
| 25 | let's see back here.  Blah, blah, blah. | 12:24:45 |

Page 169

1          Yeah, they were talking about the income --   12:24:52

2    at 10:20 on the 31st she said she would -- it was

3    probably a typo, but would check and call me back.

4          I waited until the 2nd of April.  I called

5    to talk to her.  She never called back.  That's when I  12:25:06

6    talked to Damien, who said our income was $5,780 a

7    month and that comes out to 69,000 -- my math I wrote

8    there -- now and was $11,200 a month or 134,400 a year

9    when the loan was taken out.

10         I told him he never -- we never made that    12:25:29

11   much.  I told him if that was on our original loan

12   app, that a WaMu employee lied, not us.  He said he

13   would check out the numbers and get back to me.  He

14   will call me by next Thursday at the latest.

15         And then Jessica called back and said --    12:25:45

16   instead of going over the income again, she just said

17   our income to debt ratio is too high.  It's

18   49 percent.  It needs to be 45 percent to qualify.

19         And then, of course, Damien didn't get back

20   to me with the income figures.  That's the last I    12:26:02

21   heard of it.

22       Q    Sure.  Just so it's clear, you were again

23   either reading or paraphrasing from Schulken

24   Exhibit 14?

25       A    That's correct.                           12:26:12

Page 174

1      Q    I had asked -- well, we can actually move      12:31:15

2   on.

3      A    Okay.

4      Q    Ultimately, though, it looks like by the 4/2

5   conversation, you spoke with Damien and he told you    12:31:30

6   that the income was 11,200 per month when the loan was

7   taken out?

8      A    That's correct.

9      Q    Okay.

10     A    That's what he told me and that's when I --   12:31:49

11   again, I told him that's, you know -- that was made

12   up.  I never -- I never stated that and it had to have

13   been a WaMu employee that put that on there and

14   that's -- I swear on that.

15            I would never have given those numbers.      12:32:04

16   That was probably the most frustrating part, was they

17   kept telling me my income wasn't sufficient.  Well,

18   they never told me why until then, when they said, oh,

19   because your income used to be this.  It was never

20   that.                                                 12:32:17

21     Q    And according to your 4/2/2009 notes, it

22   says that your current income is $5,780 per month; is

23   that correct?

24     A    That's accurate.  That's our net after all

25   expenses.                                             12:32:33

JEFFREY SCHULKEN   5/4/2011

Page 175

```
 1      Q    Do you think that number is incorrect?      12:32:34
 2      A    The 5780?
 3      Q    Per month.
 4      A    I think that's probably close.  I don't have
 5  the taxes in front of me, so I don't know, but --    12:32:43
 6      Q    At that time, do you recall thinking that
 7  that number was incorrect?
 8      A    The 5780?
 9      Q    Correct.
10      A    No, I don't.  I don't recall that.          12:32:53
11      Q    And on the 4/2 call that's reflected -- at
12  least it's noted as 10:00 o'clock -- it says:  Jessica
13  called and said our income to debt ratio is too high,
14  49 percent.  Should be under 45 percent to qualify.
15           Did you have an understanding of what that  12:33:19
16  meant?
17      A    I understand she was telling me that no,
18  we're not going to do anything because of this is the
19  numbers.  I didn't actually understand the numbers or
20  where they got them, but she was just telling me the   12:33:30
21  magic number is 45.  You've got 49.  Sorry, can't help
22  you.
23      Q    Do you know what an income to debt ratio is?
24      A    I do a little bit, yeah.
25      Q    At the time did you know?                   12:33:40
```

Page 176

```
 1     A     A little bit.                              12:33:42
 2     Q     Tell me what your understanding was at the
 3   time.
 4     A     Basically it's -- you have this much debt
 5   and you have this much income, and you divide them and 12:33:50
 6   that's your ratio.
 7     Q     Do you have an understanding of why lenders
 8   look at that information in connection with loans?
 9           MR. MEYERS:  Objection.  Are you asking now
10   or then?                                           12:34:01
11           MR. SALEMI:  Currently.
12           THE WITNESS:  Currently?  See if you can pay
13   your bills.  See if you have too much debt.
14   BY MR. SALEMI:
15     Q     At the time did you have an understanding   12:34:07
16   about why lenders would look at that information in
17   connection with the loan?
18     A     Yeah, I believe I did.
19     Q     What was your understanding at the time?
20     A     They wanted to make sure I could pay my     12:34:16
21   bills, which I had been doing and paying extra on top
22   of it, which is the part that drove me nuts.
23           I was paying them an extra about 1500 a
24   month average extra principal.  I had no other debt,
25   paid my credit cards to zero every month, and yet they 12:34:27
```

Page 177

1   said I couldn't -- it doesn't look like I can pay my   12:34:30

2   bills.

3        Q    Would you agree that a decline in income

4   from 11,200 a month to 5780 a month would be

5   significant?                                          12:34:44

6             MR. MEYERS:  Object.  Object to that

7   question.  First, it's ambiguous, and to the extent

8   this is a hypothetical -- are you talking

9   hypothetically?  Are you talking with specific

10  information as to the Schulkens?                      12:34:54

11            MR. SALEMI:  Is that an objection to form?

12            MR. MEYERS:  That's an objection to the form

13  of the question.

14            You can answer that question if you

15  understand it, have an idea.                          12:35:01

16            THE WITNESS:  If we're talking about the

17  Joneses, by all means.  The problem is this is the

18  Schulkens and that wasn't what our income was.

19            So I really had a hard time with them

20  getting a fabricated income level and comparing it to 12:35:14

21  the actual.  You know, why didn't they go back and

22  look at our actual income when the application was

23  taken and look to -- at our actual income.

24            There is a good chance we wouldn't have

25  qualified for that loan apparently, but that's -- I    12:35:27

Page 180

1       Q       When did you fax it?                         12:38:05

2       A       It would have been on April 2nd, I would

3    assume, if we -- I don't have the fax sheet for that,

4    do I?  No, I don't.

5       Q       In this document, can you tell me what you   12:38:17

6    were doing in the -- sort of the middle of the

7    document where you list out some figures?

8       A       Yeah.  I was trying -- this has to do with

9    that income to debt ratio.  They were telling me I was

10   at 49 percent, so I listed my mortgage with HSBC, the   12:38:33

11   WaMu HELOC, the Chase Visa minimum payment and the

12   Costco minimum payment, for a total of 17,400 -- or

13   17 -- $1,742.21 a month.  With our net income of 5780

14   a month, if you divide that out, it's a debt ratio of

15   30.142 percent.  That was my understanding.            12:38:59

16              I'm not an accountant.  I'm not a CPA.  I

17   don't really understand the ins and out of it, but

18   that was my thinking.  Hey, this is what I owe every

19   month.  This is what I make.  This is the ratio that I

20   see.                                                    12:39:17

21      Q       Do you have any training in underwriting

22   loans?

23      A       No, not at all.

24      Q       The WaMu HELOC line, you listed $240.  What

25   is that?                                                12:39:27

Page 194

1    you referring to?                                              12:55:49

2         A    Refinancing my first and drawing enough out

3    to pay off Chase.

4         Q    Okay.  And so when is this document dated?

5         A    November 30th.                                       12:56:04

6         Q    Does that help --

7         A    The date that the escrow officer signed it.

8         Q    Does that help -- I'm sorry.  Go ahead.

9         A    Of 2011 -- of 2010.

10        Q    Does that help you refresh your recollection 12:56:17

11   as to when you paid off the Chase HELOC that's the

12   subject of this litigation?

13        A    Yes.

14        Q    When did you pay that off?

15        A    That would be November 30th, 2010.  It       12:56:28

16   funded a few days later, but --

17        Q    And is there a new lender for the refinance

18   loan that you are talking about?

19        A    That would be my credit union.

20        Q    What credit union is that?                          12:56:45

21        A    Star One Federal Credit Union.

22        Q    So through this refinance loan, do you now

23   just have one first mortgage on the property?

24        A    I have one first mortgage on the property.

25        Q    So you used the proceeds from this first    12:56:59

JEFFREY SCHULKEN    5/4/2011

Page 245

| | | |
|---|---|---|
| 1 | Do you remember that? | 14:43:29 |
| 2 | A    Yes. | |
| 3 | Q    What is the principal relief being sought in | |
| 4 | this case? | |
| 5 | A    Reinstating the HELOCs that were, I feel, | 14:43:34 |
| 6 | unfairly closed. | |
| 7 | Q    When did you open up your current home | |
| 8 | equity line? | |
| 9 | A    My new one? | |
| 10 | Q    Your new one. | 14:43:45 |
| 11 | A    I believe it was February of this year. | |
| 12 | Q    Of 2011? | |
| 13 | A    2011. | |
| 14 | Q    Had Chase not kept your line suspended, | |
| 15 | would you have closed that line? | 14:44:00 |
| 16 | MR. SALEMI:  Object to the form of the | |
| 17 | question. | |
| 18 | THE WITNESS:  I -- if Chase had reopened the | |
| 19 | line, I would have stayed with Chase. | |
| 20 | BY MR. MEYERS: | 14:44:11 |
| 21 | Q    At any time did you have any interest -- | |
| 22 | strike that. | |
| 23 | Why did you feel the need to open up a new | |
| 24 | line of credit? | |
| 25 | A    I needed a new line of credit for an | 14:44:25 |

1    emergency if something happened.  If I needed to        14:44:27

2    replace the roof or some catastrophic event happened,

3    whether it be an earthquake or what have you, I needed

4    access to emergency funds in an emergency.

5         Q.   But for your Chase HELOC being suspended,      14:44:39

6    would you have opened up a new line of credit?

7              MR. SALEMI:  Object to the form of the

8    question.

9              THE WITNESS:  No.  If I had the old HELOC, I

10   would have kept it.                                      14:44:51

11   BY MR. MEYERS:

12        Q    Currently you no longer have a Chase HELOC,

13   correct?

14        A    That's correct.

15             MR. SALEMI:  Object.  Leading.                 14:44:59

16   BY MR. MEYERS:

17        Q    Do you currently have a Chase HELOC?

18        A    I have no Chase HELOC.

19        Q    Would you accept reinstatement of a Chase

20   HELOC if it was offered in this litigation?             14:45:16

21             MR. SALEMI:  Object to the form of the

22   question.

23             THE WITNESS:  I would accept a Chase HELOC

24   if it were reinstated with a competitive interest rate

25   and an apology.                                          14:45:31

Page 247

1   BY MR. MEYERS:                                          14:45:33

2       Q    What is the primary relief that you, on

3   behalf of the class, are seeking in this litigation?

4       A    I want --

5            MR. SALEMI:  Object to the form of the        14:45:39

6   question.

7            THE WITNESS:  I want the -- all the HELOCs

8   that were suspended unfairly to be reinstated to the

9   whole class, all the folks that were affected.

10  BY MR. MEYERS:                                          14:45:55

11      Q    And are you seeking a Chase HELOC or a

12  reinstatement of a Chase HELOC as part of the relief

13  you are seeking in this litigation?

14           MR. SALEMI:  Object to the form of the

15  question.                                              14:46:09

16           THE WITNESS:  Yes.

17  BY MR. MEYERS:

18      Q    Yes?  Okay.  Can you please take a look at

19  Exhibit 19.  And you can pull out Exhibit 21 as well.

20  Let me know when you have those.                       14:46:40

21      A    Okay.  I have them.

22      Q    Exhibit 19 is an April 2nd, 2009 letter; is

23  that correct?

24      A    Correct.

25      Q    And counsel, Mr. Salemi, asked you          14:46:53

1               CERTIFICATE OF REPORTER

2

3         I, KAREN SCOTT, a Certified Shorthand

4 Reporter of the State of California, hereby certify

5 that the witness in the foregoing deposition was by me

6 duly sworn to tell the truth, the whole truth, and

7 nothing but the truth in the within-entitled cause;

8

9         That said deposition was taken in shorthand

10 by me, a disinterested person, at the time and place

11 therein stated, and that the testimony of the said

12 witness was thereafter reduced to typewriting, by

13 computer, under my direction and supervision;

14

15         I further certify that I am not of counsel

16 or attorney for either or any of the parties to the

17 said deposition, nor in any way interested in the

18 event of this cause, and that I am not related to any

19 of the parties thereto.

20

21       DATED: May 17, 2011

22          Karen Scott

23       KAREN SCOTT, CRP, CSR No. 4027

24

25

# EXHIBIT R

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

-oOo-

| | |
|---|---|
| JEFFREY SCHULKEN AND JENIFER SCHULKEN, individually and on behalf of a class of similarly situated individuals, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| -vs- | ) Case No. ) C5:09-cv-2708-LHK ) |
| WASHINGTON MUTUAL BANK and JPMORGAN CHASE BANK, N.A., | ) ) ) |
| Defendants. | ) ) |

DEPOSITION OF
JENIFER SCHULKEN
Wednesday, May 4, 2011, 4:09 p.m.

REPORTED BY:

KAREN SCOTT, CRP, CSR

LICENSE NO. 4027

Page 2

```
 1              BE IT REMEMBERED THAT, pursuant to the laws
 2   pertaining to the taking and use of depositions, and
 3   on Wednesday, May 4, 2011, commencing at the hour of
 4   4:09 p.m. thereof, at ROPERS, MAJESKI, KOHN & BENTLEY,
 5   50 West San Fernando Street, Suite 1400, San Jose,
 6   California, before me, Karen Scott, a Certified
 7   Shorthand Reporter of the State of California, there
 8   personally appeared
 9                    JENIFER SCHULKEN,
10   called as a witness by the defendant JPMorgan Chase
11   Bank, N.A., who, being by me first duly
12   sworn/affirmed, was thereupon examined and testified
13   as is hereinafter set forth.
14                        - - -
15
16
17
18
19
20
21
22
23
24
25
```

1m

```
 1                        APPEARANCES

 2

 3   For the Plaintiffs:

 4             EDELSEON McGUIRE, LLC

 5             BY:  EVAN M. MEYERS, ESQ.

 6             350 North LaSalle, Suite 1300

 7             Chicago, Illinois 60654

 8             312/589-6370

 9             emeyers@edelson.com

10

11   For the Defendant JPMorgan Chase Bank, N.A.:

12             BURKE, WARREN, MacKAY & SERRITELLA, P.C.

13             BY:  MICHAEL G. SALEMI, ESQ.

14             22nd Floor, 330 North Wabash Avenue

15             Chicago, Illinois 60611

16             312/840-7112

17             msalemi@burkelaw.com.

18

19             ROPERS, MAJESKI, KOHN & BENTLEY

20             By: GEORGE G. WEICKHARDT, ESQ. (NOT PRESENT)

21             201 SPEAR STREET, SUITE 1000

22             SAN FRANCISCO, CALIFORNIA 94105

23             415/543-4800

24

25             Also present:  Arin Kerhoulas, Videographer,
                                I-Witness Video
```

JENIFER SCHULKEN    5/4/2011

Page 22

| | | | |
|---|---|---|---|
| 1 | Q | In 2003, did you purchase a van? | 16:28:22 |

2    A    Yes.  I believe so.  I can't guarantee you

3    the date.

4    Q    Okay.  Does 2003 sound about right?

5    A    Yes.                                              16:28:34

6    Q    What kind of van was it?

7    A    An E350 Ford van, passenger van.

8    Q    Why did you purchase that van?

9    A    Because with four children and a minivan, I

10   had very limited options as far as leaving the house,  16:28:52

11   car pooling, both during business and family, personal

12   hours.

13   Q    The four children that you are referring to,

14   which four children is that?

15   A    My stepdaughter, my son, and our two            16:29:10

16   children, Jeff and my two children together.

17   Q    Did you use the Ford van in connection with

18   the day care?

19   A    Occasionally.

20   Q    Do you continue to use the Ford van in          16:29:24

21   connection with the day care?

22   A    Occasionally.

23   Q    Back when you purchased it, the decision to

24   purchase the van, was it in part because you wanted to

25   use it for the day care?                              16:29:37

Page 23

1        A    No.    It was a personal vehicle.    I wanted to 16:29:43

2    leave the house during the workday with my children.

3    The first time the subject came up with my husband was

4    in the summer when the children were all home from

5    school, our children, and the only way that I could do 16:30:00

6    that, take my kids to the park while I was working,

7    was to have a larger vehicle.

8            And so, yes, I did use it during business

9    hours with the children, the day-care children, but

10   the primary reason was so that I could leave the house 16:30:18

11   during the workday.

12       Q    And you couldn't leave the house during the

13   workday because you couldn't leave the day-care

14   children at home?

15       A    Correct.                                    16:30:28

16       Q    And the minivan -- I'm sorry.    The van

17   enabled you to leave the house during the workday

18   because it enabled you to bring the day-care children

19   with you?

20       A    Yes.                                        16:30:36

21       Q    Do you know whether or not you used the

22   State Farm line of credit to ultimately pay for any of

23   the van?

24       A    I believe so.

25       Q    Do you know why you and Mr. Schulken used   16:30:50

JENIFER SCHULKEN   5/4/2011

Page 26

```
 1      A    I don't know any -- he was on the phone, I    16:33:13
 2   guess.
 3      Q    Okay.  Do you have any idea about what you
 4   were going to use that Washington Mutual HELOC for?
 5      A    To pay off --                                 16:33:22
 6           MR. MEYERS:  I'm sorry.  Object to the form,
 7   time frame that you are talking about.
 8   BY MR. SALEMI:
 9      Q    I'm talking about, when you were applying
10   for the Washington Mutual HELOC and before you had    16:33:31
11   closed, did you have an idea in your head about what
12   you would use that HELOC for?
13      A    The Washington Mutual HELOC?
14      Q    Correct.
15      A    To pay off the State Farm HELOC.              16:33:42
16      Q    Any other uses?
17      A    At the time, that was our primary reason.
18      Q    At the time do you recall how much was --
19   what the balance was on the State Farm HELOC?
20      A    I can't recall.                               16:34:01
21      Q    Did you -- did your intended use of the
22   HELOC change over time?
23           MR. MEYERS:  I'm going -- I'm going to
24   object to the form of the question.  When you are
25   referring to "intended," you mean at any time?  I'm   16:34:17
```

DOKICH COURT REPORTERS, INC.

Page 41

1    BY MR. SALEMI:                                          16:50:06

2        Q    Do you know -- well, at the time, say, after

3    October 2005, do you know how many credit cards you

4    had?

5        A    I believe one or possibly two.  There may    16:50:15

6    have been -- me personally?  Sorry.  I believe I had

7    one.  I believe it was a joint card with my spouse.

8        Q    Do you recall having a Chase Amazon Credit

9    Card?

10       A    Yes.                                           16:50:34

11       Q    Do you recall having a Costco credit card?

12       A    I don't have the credit card.  I just have

13   the membership.  My husband has the credit card.

14       Q    Okay.  For the Chase Amazon Credit Card, you

15   said you were involved in the spending.  Both you and  16:50:48

16   your husband used that credit card; is that right?

17       A    Correct.

18       Q    And for the Costco credit card, it sounds

19   like just your husband used it?

20       A    Correct.  But I made the list.               16:51:00

21       Q    You made the list meaning what?

22       A    That when he went shopping.

23       Q    And for Costco are you talking about?

24       A    Uh-huh.

25       Q    When you made the list, what kind of things  16:51:14

JENIFER SCHULKEN     5/4/2011

Page 42

```
 1   would you put on the list in this time frame, let's      16:51:15
 2   say, late 2005, early 2006?
 3       A    So if he was working with me, it would
 4   have -- so it would have been supplies that we needed.
 5   Paper towels.  I would have him buy gloves, wipes,       16:51:41
 6   formula, food for our family.  We would purchase our
 7   meat there in bulk.  We have a lot of mouths to feed.
 8   Canned food, lotion, shampoos, razors, dishwashing
 9   detergents, things like that.  And then, you know, you
10   can't just leave Costco with what's on the list.        16:52:23
11       Q    I love Costco.
12            In the last five years or so, has that list
13   typically stayed -- included the things that we just
14   talked about?
15       A    Yes.                                            16:52:34
16       Q    And that includes paper towels, gloves,
17   wipes, formula for the Wee Ones Day Care?
18       A    Correct.
19       Q    It also includes some things that were for
20   personal use as well?                                   16:52:41
21       A    Correct.
22       Q    Has that stayed constant?
23       A    Yes.
24       Q    For the Amazon -- Chase Amazon Credit Card,
25   did you also use that?                                  16:52:50
```

JENIFER SCHULKEN   5/4/2011

```
                                                     Page 43
 1      A    Yes.                                    16:52:54

 2      Q    Well, I guess, in addition to your husband,

 3   did you use that?

 4      A    Yes.

 5      Q    What types of things did you personally use  16:52:58

 6   the Chase Amazon Credit Card for?

 7      A    Amazon purchases.  Toys for both personal

 8   use, our children.  Any time I purchased anything from

 9   Lakeshore or Discount School Supply which our child

10   care purchases.  I used the credit card for doctors'  16:53:17

11   visits, prescriptions, gas.  We used the card for

12   everything.  Eating out.

13      Q    You mentioned Lakeshore?

14      A    Correct.

15      Q    Tell me what that is.                    16:53:36

16      A    Lakeshore Learning.

17      Q    And tell me what that is.

18      A    It's a store, a high-class toy store,

19   educational toy store.  It's not just day-care

20   supplies.                                        16:53:48

21      Q    Would you purchase day-care supplies from

22   Lakeshore Learning?

23      A    Yes.  I have purchased both personal, for my

24   children, and child-care toys.

25      Q    So if there are transactions on the      16:53:59
```

Page 63

1    A    I do believe it's inaccurate.                    17:24:38

2    Q    Why do you believe it's inaccurate?

3    A    Because the charges on the Chase Visa and

4    the Costco card were not solely or primarily used for

5    the business.                                         17:24:54

6    Q    As of April 2nd, 2009, your husband was

7    still primarily responsible for those credit cards; is

8    that correct?

9    A    He was in charge of paying the bills, yes.

10    Q    Okay.  What leads you to believe that those  17:25:08

11    credit cards were not primarily for business expenses?

12    A    Because I am the primary spender of the

13    money that he was paying off, and I did not spend the

14    majority of the money on the child care.  The majority

15    of the money spent was personal use.                 17:25:26

16    Q    Do you know why it says, "The majority of

17    these charges are business expenses"?

18    A    I believe it was because he was frustrated

19    that -- that the child-care expenses that were already

20    being taken out of our income were being dinged       17:25:40

21    against us again.  Does that make sense?

22    Q    Did you discuss that particular sentence

23    with your husband around this time, early April 2009?

24    A    We did talk about that in April, about how

25    we were being charged -- it was being charged against 17:25:57

Page 64

```
 1    us twice.                                                17:26:00

 2         Q    And what did you discuss with your husband?

 3         A    That that wasn't fair.

 4         Q    And what did he say, if anything, about what

 5    he was going to do?                                      17:26:08

 6         A    Oh, he just said he was going to write a

 7    letter.

 8         Q    Did you discuss specifically saying that the

 9    majority of these charges on those credit cards were

10    businesses expenses?  Did you discuss that portion of    17:26:20

11    it specifically with him?

12         A    That paragraph?  That sentence?

13         Q    Yes.

14         A    I didn't discuss it specifically with him

15    regarding writing this letter.  We know our business    17:26:31

16    expenses are not the majority of our income.  You

17    know, expenses are our family costs a lot more than

18    the day care.

19         Q    Did he know that at the time, April 2009?

20         A    I believe he did.                              17:26:46

21         Q    Do you know why he stated that the business

22    expenses are the majority of the charges on those

23    credit cards?

24         A    I believe he was frustrated and

25    sleep-deprived.  He hadn't been sleeping well after     17:26:55
```

Page 93

18:09:01
1   class.

2   BY MR. SALEMI:

3       Q    Do you have a -- you do not have a HELOC

4   with Chase anymore?

5       A    We do not.                          18:09:06

6       Q    It's closed and terminated; is that correct?

7       A    Yes.

8       Q    Are you seeking to have a new HELOC with

9   Chase?

10      A    We would love to have a new HELOC with Chase 18:09:16

11  if the business practices and the interest rate were

12  right.

13      Q    As a part of this litigation, are you

14  seeking relief that would give you a new HELOC with

15  Chase?                                       18:09:33

16      A    Yes.  With the right interest rate and with

17  better business practices.

18      Q    How would you get that new HELOC with Chase?

19           MR. MEYERS:  Object to the form of the

20  question.                                    18:09:45

21           If you understand, you can answer.

22           THE WITNESS:  I imagine we would apply or be

23  offered one.  I don't think, honestly, at this point

24  we would apply with Chase, but if the business

25  practices had -- were changed and the interest rate  18:09:57

Page 95

1    financial information.  I had to be here.  We have to  18:10:54

2    give you all our documents, and we filed with our

3    names on the lawsuit.

4         Q    Any other understanding?

5         A    I am sure there is more.  Off the top of my  18:11:12

6    head, no.

7         Q    Have you been promised anything in exchange

8    for being a class representative?

9         A    I have not.

10        Q    Do you have an understanding of what you    18:11:32

11   might get out of this litigation?

12        A    It's my understanding that we'll probably

13   get nothing.  We're not -- we're not in this to get

14   anything.  We would just like everything to be

15   righted.                                              18:11:49

16        Q    And what do you mean by that?

17        A    That the business practices of Chase change

18   and that they don't take HELOCs away and suspend lines

19   from people that are paying their bills or are working

20   hard to meet their responsibilities.                 18:12:05

21        Q    Are you paying your attorneys in this case?

22        A    We are not.

23        Q    Do you know how they're going to be paid, if

24   at all?

25        A    It's my understanding that if they win, they 18:12:18

CERTIFICATE OF REPORTER

I, KAREN SCOTT, a Certified Shorthand
Reporter of the State of California, hereby certify
that the witness in the foregoing deposition was by me
duly sworn to tell the truth, the whole truth, and
nothing but the truth in the within-entitled cause;

That said deposition was taken in shorthand
by me, a disinterested person, at the time and place
therein stated, and that the testimony of the said
witness was thereafter reduced to typewriting, by
computer, under my direction and supervision;

I further certify that I am not of counsel
or attorney for either or any of the parties to the
said deposition, nor in any way interested in the
event of this cause, and that I am not related to any
of the parties thereto.

DATED: May 16, 2011

Karen Scott

KAREN SCOTT, CRP, CSR No. 4027

116