# EXHIBIT X

## RESPONSE TO REQUEST FOR PUBLIC COMMENT

---

From: KamberEdelson LLC (Edelson McGuire LLC, as of January 15, 2010)

To:     Board of Governors of the Federal Reserve System

Re:     Analysis of Proposed Rule Governing Home Equity Lines of Credit ("HELOCs")
        Regulation Z, 12 C.F.R. 226.5(b) and Commentary 12 C.F.R. Part 226, Supp. I and
        Response to Request for Public Comment, Fed. Reg., Vol. 74, No. 164, published August
        26, 2009

Date:   December 22, 2009

### I.    INTRODUCTION

        In the wake of the TARP bailout, thousands of Americans have seen their home equity
credit lines ("HELOCs") – which they use for personal purposes including household expenses,
college tuition and as safety nets for unanticipated medical bills – practically disappear.
Claiming that either the borrowers' home values have declined or that their financial
circumstances have suffered material adverse changes, lenders have slashed and frozen HELOC
accounts nationwide with reckless abandon. Although Regulation Z allows banks to take such
action against a particular HELOC when a "sound factual basis" exists for doing so,
unfortunately, rather than invest the time to acquire such a basis, lenders instead routinely reduce
and suspend HELOCs *en masse*—wrongfully choking off HELOCs for customers who have not
experienced any adverse change in finances and whose homes have not significantly declined in
value in the process.

        **The greatest threat to HELOC customers comes from mass HELOC suspensions
and reductions that enable lenders to avoid actually obtaining sound factual bases before
taking action and, being devoid of transparency, make it nearly impossible for borrowers
to challenge the banks' erroneous decisions.**

        No one can argue that, given general declines in property values and the challenges posed
by steady unemployment, responsible lending will often require financial institutions to take
action to protect themselves and their potentially overextended borrowers by suspending
accounts or reducing credit limits. At the same time, broad-based HELOC reductions and
suspensions, and their concomitant level of decreased scrutiny, unfairly result in suspensions and
reductions for customers who have not experienced adverse changes in either their finances or
property values. Coupled with an appeals process where the deck is stacked in favor of the bank,
a typical aggrieved borrower has no choice but to accept the bank's decision. Depriving these
borrowers of their bargained-for credit hurts both the borrower on an individual level, as well as
– and contrary to the purposes and principles underlying the Troubled Assets Relief Program –
the economy as a whole by unnecessarily restricting the availability of affordable credit.

        It is therefore critical to devise rules that provide clear guidance to lenders and consumers
that strike the proper balance between, on the one hand, a bank's desire to act quickly at minimal

cost and, on the other hand, a borrower's statutory and contractual rights to his or her HELOC. Even in market declines, Regulation Z must continue to temper a bank's ability to overcorrect by requiring that, prior to any suspension or reduction, the banks must have a sound factual basis for concluding that either the borrowers' home values have significantly declined or that a change in the borrower's financial condition renders the borrower unable to meet the repayment obligations of the account.

For over the past year, our law firm has conducted an investigation into many of the nation's largest lenders, specifically their HELOC reduction and suspension practices. As a part of our investigation, we have spoken with hundreds of borrowers with HELOC accounts with banks including Citibank, JPMorgan Chase (and WaMu), Wells Fargo (and Wachovia), Bank of America (including Countrywide), GMAC, DiTech, Morgan Stanley, and National City. As a result, we have filed lawsuits against several of these lenders seeking to enjoin those HELOC reduction and suspension practices that are patently unfair to consumers.

We offer this Response to the Board's request for comment and analysis of the proposed changes to Regulation Z. In addition, our attorneys are willing to testify or otherwise contribute to the Board's informed decision-making as the Board will allow.

As described below, several the proposed changes take important steps in helping make HELOC reductions and suspensions fairer to consumers. At the same time, certain proposed changes, while facially consumer-friendly, actually tip the balance too unfairly in favor of banks that are simply looking to close off HELOCs. This Response to the Board's request for comment analyzes the proposed changes within the context of the HELOC reduction and suspension process, including: (1) initial lender investigation, (2) lender action and the issuance of notice, and (3) borrower requests for reinstatement. This Response then comments on the newly proposed rules and raises additional concerns not presently addressed by either the current or proposed commentary.

## II.   HELOC REDUCTIONS AND SUSPENSIONS IN PRACTICE TODAY

For both claims of significant declines in property value and in cases of material changes in income, HELOC lenders employ a variety of approaches designed to reduce or suspend the maximum number of accounts as quickly and cheaply as possible. Although practices vary among banks, there are of significant similarities that enable one to get a general picture of prevailing practice.

### Claims of Declines in Property Values

Discussions with aggrieved borrowers have indicated that most lenders claim to borrowers that they are imposing new, internal LTV requirements on all existing lines of credit. Hence, if a CLTV is above 80%, for example, the bank will reduce or suspend the line so as to bring the CLTV down to 70%. To accomplish this retrofitting for cases involving declines in home value, the lender starts by obtaining AVMs for particular groups of properties generally located at or near areas where there has been an overall decline in the real estate market. The banks do not reveal the precise variables used in these models and some, such as Chase, claim to

2

not have access to such information because the models are proprietary computer algorithms owned by the AVM vender (most often for Chase and others, First American CoreLogic). There are no assurances that these models omit short sales and foreclosures.

After receiving the AVM, the bank computes the significance of any purported decline in home value based on the bank's internal standards that, due to an overall lack of transparency, are unknown. The bank then either reduces the credit limit to just above the outstanding balance or suspends the account. This change is often reflected on borrower internet accounts shortly thereafter, generally through a "$0 balance available" or some other notation.

The bank then sends out notice of its decision. The notices most often state a bare reason that the account has been suspended or reduced due to either "a significant decline in the property's value" or that "the current value of the property no longer supports the existing credit line." Though some banks include the AVM-generated value in their notices, most do not, and none of the notices identify the actual decline in property value or the values required for reinstatement—which are the numbers actually needed to determine whether to challenge the banks' decision.

**Claims of Material Changes in Financial Circumstances**

For material changes in financial circumstances, the initial investigations take different forms depending on the bank. Wells Fargo, for example, has reduced or suspended HELOCs based on single derogatory items that appear on its borrowers' credit reports, without regard to whether the item is disputed or actually reflective of an adverse change in financial circumstances that would render the borrower unable to meet the terms of the HELOC.

JPMorgan Chase, on the other hand, often sends letters requesting financial information, such as IRS FORM 4506-T, within 14 days despite the fact its HELOC contracts do not require borrowers to submit such a document, much less that it be submitted by any such arbitrary deadline. The notice never informs the customer why the information is being sought or what the consequences are of failing to submit the completed form within 14 days. Instead, the notices state that Chase may request such papers under the HELOC agreements. When customers fail to return the requested Form, or if Chase deems a particular submission somehow deficient, Chase suspends the accounts – sometimes before the initial 14-day deadline – claiming that it cannot verify the borrowers' financial conditions. In litigation, Chase has claimed a right to suspend or reduce such accounts under both the exception for material adverse changes in financial circumstances as well as the exception for material breaches of the HELOC contracts (in failing to submit the requested information, as purportedly required under the contracts).

Similar to the notices for supposed significant declines in property values, notices based on financial changes generally contain the bare assertion that the HELOC is being reduced or suspended due to a "a material adverse change in your financial circumstances." The notices are devoid of specifics such as the actual change in financial circumstances the lender is relying on, meaning it is unclear whether any lender considers changes in income or other factors actually indicative of financial health.

3

In both types of cases, when borrowers contact the lenders to participate in so-called "appeals processes," they are met with a tangle of confusing, ill-informed customer service representatives who continue to, presumably unwittingly, withhold critical information necessary to fairly determine whether to challenge the bank's decision. Without knowing what value the bank needs a home to be worth – and the equation used to reach that figure – or what the change in financial circumstances was, or how it was material, borrowers are often helpless against lender abuses.

This lack of transparency is critical. Without being informed of how the banks reached their decisions, borrowers cannot compare the practices of lenders consistent with the purposes of TILA. The lack of transparency is particularly problematic because banks often reduce or suspend HELOCs without a sound factual basis for such actions and, thus, in situations where a consumer could truly benefit from an appeal for account reinstatement.

## III. <u>KEY POINTS</u>

1.      Many of the major banks that received TARP funds did so on the condition the money be used to lend. These same banks are the major offenders when it comes to wrongful and unfair HELOC reduction and suspension practices.

2.      Following many HELOC reductions and suspensions, the banks will offer and issue high interest credit cards to aggrieved borrowers, indicating that the borrower is not too risky to lend money to, but rather that the bank does not want to loan the money at the attractive interest rates many HELOC contracts provide.

3.      The proposed commentary makes a handful of helpful changes but mostly caters to the banks' desire to reduce and suspend as many HELOCs as possible while expending the least amount of time and resources. As a result, banks will be further encouraged to reduce and suspend HELOCs *en masse*, without first obtaining sound factual bases for their actions.

4.      Mass HELOC reductions and suspensions result in banks wrongfully taking action against borrowers that present minimal risk to the banks, and who have not experienced either a significant decline in home value or material adverse change in finances. This deprives healthy borrowers with low risk from the affordable credit lines they bargained for and amounts to little more than allowing banks out of contracts the banks no longer want to honor.

5.      The proposed changes do not provide necessary guidance so that customers can ascertain when a decline in home value is insignificant. By only providing lines to know when a decline is significant beyond question (as a "safe harbor" scheme does), borrowers are left powerless to demonstrate that a bank has taken action when only an insignificant decline has occurred.

6.      The proposed changes take away the right to meaningfully appeal a bank's wrongful decision. Rather than require a bank to consider an actual on-site appraisal when a customer appeals, the proposed changes simply allow the bank to re-run the faulty AVMs.

Hence, the proposed change to a "free first appeal" does not help borrowers because the banks merely have to get another AVM as opposed to bearing the costs of an accurate appraisal.

7.     The proposed changes bless the use of certain hedonic and hybrid AVMs without regard to whether such valuations substantively account for actual property characteristics like home improvements.

8.     By not prohibiting such action, the proposed changes would allow banks to strip HELOCs away from borrowers based on single changes to the borrowers' credit scores, irrespective of whether the change actually impacts the borrowers' financial circumstances.

9.     The proposed commentary does not address several critical issues, such as unfair, after-the-fact notices, lender claims that Regulation Z does not apply to HELOCs owned by small business owners, and lenders who exert undue influence over appraisers.

## IV.    ANALYSIS OF PROPOSED CHANGES

To begin, the Board should be commended for its clearly thoughtful work in crafting the proposed regulations. We hope that this Response will be taken constructively, as all parties seek to strike the right balance between the interests of Wall Street with those of borrowers. Given that mass suspension and reduction practices pose the greatest danger to ordinary consumers (generating the greatest error due to a failure to account for individualized determinations of property values and borrower financial health), the following comments are generally aimed at curtailing the occurrence and abuse of such practices.

### A.    Suspension and Reductions

#### 1.    *Purported Significant Declines in Home Values.*

##### a.    Equity Cushion Approach and First Mortgage Pay Downs

The Board seeks comment as to whether the Board "should provide guidance clarifying that the creditor may (but does not have to) consider any changes in available equity based on how much the consumer owes on a mortgage with a lien superior to that of a HELOC."

**Recommendation:** The answer is that the Board should provide guidance <u>requiring</u> creditors to consider any changes in available equity based on how much the consumer owes on a mortgage with a lien superior to that of a HELOC. Without such consideration, banks will continue reducing and suspending HELOCs even though the homeowners have significantly paid down their primary mortgages and there has been no decrease whatsoever in the available equity or increase in the lenders' risk (insofar as that is to be the measuring stick).

Taking a brief step back, under the current and proposed regulations and commentary, lenders may unquestionably reduce or suspend a HELOC when the available equity in the home is reduced by at least 50%. Conceptually, this "equity cushion safe harbor" approach is unnecessary insofar as a need exists to ensure lender security. After all, even at 98-99% CLTV,

the lender is completely secure, able to foreclose on the line and be paid the full value of the credit limit (the extra $1 - 2\%$ going to pay the costs of foreclosing and reselling). The equity cushion approach therefore really asks how much additional or extra available equity the lender needs to <u>feel</u> safe in extending the credit. It has little to do with whether the lender actually <u>is</u> safe. Given that this extra equity is an unnecessary measure of lender security, since the lender is already secure, the Board should consider a bright-line rule that pay less attention to "declines" in the equity cushion, and instead focuses on the amount of the equity cushion. For example, the Board could consider a rule that says that a $50,000 equity cushion is sufficient irrespective of any actual *decline* in home value or available equity.

Nevertheless, and assuming the "decline in equity cushion approach" to lender security is ultimately adopted, a key issue with the present and proposed guidelines concerns the consideration of first mortgage pay downs and other changes to the first lien balance. As a preliminary matter, the proposed regulations indicate that present commentary does not require or prohibit consideration of changes in first mortgage balances. It should be noted that it is difficult to locate support for this assertion in the present commentary, which does not speak to first mortgage balances one way or the other. No matter the position ultimately adopted, lenders are likely to unfairly seize upon this language to assert as fact that Regulation Z presently allows but does not require consideration of such changes, when that position is not contained in the present regulation or commentary. On the contrary, the current commentary provides a 50% safe harbor based on the amount of equity available in the property. Thus, the implication is that banks currently should be considering the level of equity.

Hinging HELOC suspensions and reductions to declines in available equity without even considering first mortgage pay downs or changes in other lien balances effectively, and unfairly, ignores half the equation. If there is going to be a rule based on an equity cushion, then the level of equity should be computed accurately. Without consideration of changes to the first mortgage balance or other liens, banks are not actually computing the change in the available equity cushion or their level of perceived risk—they are merely reducing or suspending HELOCs based on what an AVM dictates as the property value. For example, we are aware of numerous customers for whom the primary mortgage balance was decreased in an amount equal to or greater than the purported decrease in property value. In such scenarios, banks would seemingly be given the option to suspend or reduce the credit line despite the fact that the bank has even more security than it did when the line was first issued.

Most importantly, the banks' current practice of ignoring the available equity encourages mass HELOC reductions and suspensions and serves as little more than a means of allowing creditors to break their contracts. Consideration of first mortgage pay downs requires lenders to sit down and actually compute the change in available equity prior to suspending or reducing an account. Without this step, lenders are freed up to apply their reductions and suspensions on larger scales, ignoring individualized account determinations and wrongfully suspending or reducing certain accounts in the process. This facilitation of "shoot first ask questions last" approach, again, runs counter to the admonishment that banks should act with a sound factual basis prior to taking adverse action.

6

Also, it is worth mentioning that the absence of a requirement that banks consider first mortgage pay-downs discourages borrowers from paying down their first mortgages, whether intentionally in an attempt to offset any purported decline in home value or otherwise. In a period when borrowers should be careful to not overextend themselves, discouraging first mortgage pay downs counteracts that goal.

It is interesting that the Board suggests that a bank may consider a primary mortgage to the extent there is negative amortization on the first mortgage balance. This means that a creditor would be allowed to consider the first mortgage balance when it helps justify a reduction or suspension, but that same creditor would not have to consider such a balance when doing so would prohibit the creditor from acting. This type of one-sided approach, which only serves the interests of lenders who desire to suspend or reduce as many HELOCs as quickly and cheaply as possible, goes too far in allowing banks to act to the detriment of borrowers.

**Recommendation:** Insofar as the Board adopts a rule for suspensions and reductions based on available equity, creditors should actually be required to compute the available equity, which undoubtedly includes consideration of the change in the balances—either positive or negative—of any first mortgages or other liens. Otherwise the banks are not actually required to compute the change in available equity. A contrary rule does little else than allow banks to waive AVM values in its borrowers' faces and claim, without actually knowing whether it is true, that the purported declines in values are in fact "significant," reducing the statutory exceptions to mere pretext.

It should be noted that acquiring such information would not be unduly burdensome or costly. As banks already request information relating to a borrower's financial health, in those cases where a different lender holds the primary mortgage, the HELOC creditor can send a request for updated first mortgage balance information to the customer at minimal cost.

    b.  Proposed Safe-harbor Changes

The proposed use of two safe-harbors (keeping the current 50% reduction in equity for "normal" CLTVs and 5% reduction in overall home value for "high CLTVs" (over 90%)) is helpful insofar as it provides a bright line to demonstrate when a bank's determination that a decline is significant is beyond question. It should be made clear that, consistent with the recommendation above that first mortgage pay downs be considered, whether a property represents a "high LTV" situation should be measured at the time of the suspension or reduction, as opposed to simply looking at the time the HELOC was entered into.

In either case, the use of these safe-harbors is not enough to protect consumers against mass reductions and suspensions, however, because the issue remains that there is no similar bright line used to determine when a decline in value is definitely nominal or "insignificant". This is despite the present commentary's seemingly prohibition against such reductions or suspensions. *See* 12 C.F.R. Part 226, Supp. I, ¶ 5b(f)(3)(i) at 2 ([A] contract cannot contain a provision allowing the creditor to freeze a line due to an insignificant decline in property value since the regulation allows that response only for a significant decline.")

7

Although one would hope that lenders would exercise due care and play it safe by acting within the safe-harbor, that is not how it works in practice. The lack of a definition for when a decline is nominal or insignificant allows lenders who act outside the present safe-harbors to claim such declines are actually significant due to vague, wholly undefined "individualized circumstances"—thereby rendering it difficult if not impossible for any aggrieved borrower to show that a decline, however minimal, was insignificant (leaving practically only those borrowers who can demonstrate an *increase* in property value able to withstand creditor abuses). In practice, the burden eventually falls on the borrower to disprove that the decline was significant.

Hence, without a counterbalancing mechanism that signals when a decline is insignificant, borrowers are at a disadvantage as lenders may perform mass reductions or suspensions on HELOC accounts as they see fit and then claim that any decline they deem significant, is significant, irrespective of whether or not it falls in the present or proposed safe-harbors. Put simply, there is nothing that requires or even encourages banks to act within the safe-harbors, as there is no consequence for failing to do so.

**Recommendation:** The Board should consider changing the present and proposed "safe harbors" to bright line rules. If the home value falls within the safe harbor, it may act. If the bank acts outside the safe harbor, the HELOC should be reinstated. A bright line could be set at even a 40% decline.

Short of making the switch from a safe harbor to a bright line, the Board should seriously consider implementing a rule that expressly prohibits reductions and suspensions due to insignificant declines in property value. A proposed "insignificant change" line could be established, for non-"high LTV" situations, at over 35% (ie., anything under a 35% drop in the available equity cushion is insignificant.)[1] In the example provided for in the Commentary, a $100,000 home with a $50,000 first mortgage and a $30,000 HELOC, a reduction from $100,000 to $90,000 ($10,000 decline in property value) is considered significant since it constitutes 50% of the original equity cushion. A drop in value of $7,000, resulting in a decline in equity of 35% (.35 x $20,000 in available equity) means that the house is still worth $93,000 and that $13,000 of the bank's original extra $20,000 equity cushion remains intact. Banks and borrowers would know in such situations that a significant decline had not occurred and that the line may not be reduced or suspended. For equity cushion declines that fall in between 50% and 35%, lenders would have to demonstrate that circumstances are present that would allow for a reduction or suspension outside the safe-harbor.

Although not as efficient as a change from the safe harbor system to a bright line rule, this proposed 35% Insignificant Decline Rule would allow borrowers to reduce and suspend HELOCs when significant declines had occurred while prohibiting such action when the declines are merely nominal. The 35% Rule would provide an easy to follow guidepost for lenders and borrowers, thereby reducing litigation caused by the lack of clarity. And critically, the proposed

---

[1]     Again, this assumes a proper consideration of first mortgage reductions due to principle payments or, as a result of negatively amortizing first liens or other factors, increases in principle.

35% Rule would curb the occurrence of mass HELOC reduction and suspension practices that encourage banks to act without sound factual bases. Without such a rule, creditors can demonstrate a decline was significant, but borrowers are powerless to show a given decline was not, leading *de facto* to a situation where a "significant decline" really means "whatever the bank says it means" so that the banks can void any HELOC contracts they no longer wish to honor.

                c.      Use of AVMs and other Property Valuations When Suspending or Reducing a HELOC

In what is characterized as a "technical change," the proposed rule "would eliminate references to the 'appraised' value in both the regulation and commentary, to reflect that appraisals are not required to originate many HELOCs, nor are they required to establish a basis for taking action under this provision. *See* existing comment 5b(f)(3)(vi)–6." 74 Fed. Reg. 164, at 43490.

This aspect of the proposed rule conflicts with *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565 (1980), which requires the regulations not be inconsistent with the language of the statute. The statutory language of TILA itself provides that a creditor may reduce or suspend a HELOC "during any period in which the value of the consumer's principal dwelling which secures any outstanding balance is significantly less than the original *appraisal* value of the dwelling." 15 U.S.C. §1647. The guidance of Office of the Comptroller of the Currency, Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, Office of Thrift Supervision, "Interagency Appraisal and Evaluation Guidelines," SR Letter 94–55 (Oct. 28, 1994), suggests appraisals are necessary to open HELOCs of $250,000 or higher. However, this guidance should not apply to any HELOC insofar as such a guideline is contrary to the language of the statute. Hence, congressional intent suggests an actual appraisal is required, as opposed to an AVM, Tax Assessment Valuation ("TAV") or Broker Price Opinion ("BPO"), at least upon the opening of a HELOC account.

In practice, it is unclear which lenders require an appraisal to open a HELOC, or whether those that do require appraisals for all HELOC accounts, as opposed to just a portion. What is clear is that in present practice, most major financial institutions use AVMs to obtain home values prior to performing mass HELOC suspensions and reductions. Though most banks would argue that use of such methods in and of itself satisfies the requirement that the banks act with sound factual bases prior to suspending or reducing each HELOC account, the major issue with each of these valuation methods is that they horse trade accuracy for expediency. It is unlikely that such models, used alone, fairly consider individualized property characteristics such as location and, particularly, home improvements (which HELOCs are regularly used to finance).

Additionally, AVMs are particularly problematic in that they allow lenders to act with minimal transparency. When aggrieved borrowers as Chase, for example, how Chase's AVM arrived at the present home value, Chase claims to not have access to such information because the models are proprietary algorithms owned and held by First American CoreLogic, Chase's AVM vender. Again, without transparency borrowers can neither dispute the bank's decision nor compare lender practices so as to make informed borrowing decisions. And having stripped borrowers of the ability to mount a meaningful challenge, nothing stands in he way of mass

reductions and suspensions, and nothing stands in the way of banks breaching their HELOC contracts with impunity. Hence, while AVMs and other property valuation methods could be used in conjunction with other evidence (in lieu of an actual appraisal) to determine a home value decline, used alone they exacerbate the incidence of error by their omission of key variables and their facilitation of mass HELOC reductions and suspensions.

The proposed new changes solidify the use of AVMs (and, to a lesser extent, broker price opinions and tax assessment valuations). With respect to the sanctioning of "hedonic" or "hybrid" AVMs, it is unclear at this time what specific property characteristics are considered in those models. Whereas an appraisal would account for factors such as square footage, number of rooms, location and, particularly, home improvements, allowing valuation methods that do not account for such factors, even if they bare the name "hedonic" or "hybrid," does not adequately protect consumers from being wrongfully deprived access to their HELOCs. Furthermore, it is unclear whether such models incorporate data points from short sales and/or foreclosures, both of which generally would generally be excluded from an appraiser's comparables and threaten to artificially deflate property values, and allow banks to void their contracts, on a grand scale.

**Recommendation:** To adequately protect consumers, it is recommended that the Board consider a rule that substantively incorporates the guidance provided by the FDIC's May 16, 2005 Financial Institution Letter (FIL-45-2005) *Credit Risk Management Guidance for Home Equity Lending*, which provides:

> *AVMs* – When AVMs are used to support evaluations or appraisals, the financial institution should validate the models on a periodic basis to mitigate the potential valuation uncertainty in the model. As part of the validation process, the institution should document the validation's analysis, assumptions, and conclusions. The validation process includes back-testing a representative sample of the valuations against market data on actual sales (where sufficient information is available). The validation process should cover properties representative of the geographic area and property type for which the tool is used.
>
> Many AVM vendors, when providing a value, will also provide a "confidence score" which usually relates to the accuracy of the value provided. Confidence scores, however, come in many different formats and are calculated based on differing scoring systems. Financial institutions that use AVMs should have an understanding of how the model works as well as what the confidence scores mean. Institutions should also establish the confidence levels that are appropriate for the risk in a given transaction or group of transactions.

These guidelines place actual requirements on lenders to minimize, as opposed to sidestep, the rate and degree of error. The Board should consider whether these guidelines should be clarified so that lenders may not shift the responsibility for validating and documenting the models to third-party AVM vendors. These guidelines should further be clarified to prohibit AVMs from incorporating short sales and foreclosure sales that unfairly depress property values and would be typically excluded from appraisals. Additionally, the Board should also consider

whether AVMs should be updated when new appraisal information is received.  Once clarified, the proposed regulations should incorporate these guidelines explicitly.

### 2.   *Purported Material Adverse Changes in Financial Circumstances.*

a.   "Unable to Pay" Standard

Under the present regulations and commentary, a creditor may reduce or suspend HELOC accounts where the borrower has experienced a material adverse change in financial circumstances such that the creditor reasonably believes the borrower will not be able to meet the terms of the HELOC contract.  The Board has requested comment on:

> Whether the Board should consider expressly interpreting the "unable" to pay standard to mean, for example, that the change in the consumer's financial circumstances resulted in the consumer's likelihood of defaulting "substantially" increasing.  Another possible interpretation on which the Board requests comment is that the "unable" to pay standard required that, as a result of a change in the consumer's financial circumstances, the consumer moved into a higher default risk category than at origination (based on the statistical likelihood of default) such that the creditor would not have made the loan or would have made the loan on materially less favorable terms and conditions.

*See* Proposed Changes, 74 Fed. Reg. 164. at 43493.

**Recommendation:**  These rules threaten to substitute an actual investigation into the borrower's ability to meet the repayment terms of the HELOC, which could be done via the borrower's submission on a periodic basis of a standard personal financial statement listing assets and liabilities, with proxies that do a relatively poor job of signaling overall financial health.  In the end, neither of these proposed standards actually protect banks—they just make it easier for banks to reduce and suspend accounts where no suspension or reduction is warranted.

With respect to the likelihood of defaulting "substantially" increasing standard, such a rule would unfairly penalize borrowers that initially presented no real risk of default, but now present "some" risk, however nominal.  Rather than focus on whether the likelihood of default has increased (significantly or otherwise), as that is merely a comparison to a presumed initial likelihood of default – which may have been zero or close thereto – at best the focus should be on the actual likelihood of default.  If the financial circumstances have changed such that there actually is a significant likelihood of default, then the creditor should be able to take action.  At the very least, what constitutes a "significant likelihood of default" should be the subject to some comments or debate.  Hence, a rule based on "higher default risk categories" fails as it is too subjective (as its based on the creditor's internal standards regarding default categories and allows the lender to make irrefutable claims that it would not have made the loan or would have done so only on less favorable terms) and makes it nearly impossible for borrowers to compare lender practices.

In practice, the rule should be tied simply to the borrower's ability to meet the terms of the HELOC so that the creditor is secure. As discussed in subsection (c) below, this requires an actual examination of the borrower's assets and liabilities, not simply a rule creditor's can take cover behind following mass HELOC suspensions and reductions.

       b.     6 Month Safe-harbor

The proposed new rules provide that evidence of significant changes in financial circumstances includes, but is not limited to, a significant decrease in borrower income, credit report information showing late payments or nonpayments, such as delinquencies, defaults, or derogatory collections or public records related to the consumer's failure to pay other obligations. Specifically, the Board proposes a "6 month safe harbor" which would:

> require that these payment failures must have occurred within a reasonable time from the date of the creditor's review of the consumer's credit performance. A safe harbor for determining whether a payment failure occurred within a reasonable time from the date of the creditor's review would be one that occurred within six months of the creditor's suspending advances or reducing the credit limit. In addition, the consumer cannot have brought the account on which the payment failure occurred current as of the time of the creditor's review.

See Proposed Changes, p, 43493. This rule is tempered by a separate proposed rule that would draft proposed comment 5b(f)(3)(vi)-6 to specify that the payment failures may "not be solely late payments of 30 days or fewer."

**Recommendation:**    The proposed changes threaten consumers in several ways. First, a borrower may dispute a credit report item, but the credit reporting agency will still list the account as more than 30 days past due. Hence, borrowers may see their HELOCs suspended or reduced for minimal credit report items that are subject to pending credit disputes by the customer. The regulation should include that, in addition to the rule that the "consumer cannot have brought the account on which the payment failure occurred current as of the time of the creditor's review," the credit report item cannot be one that is presently subject to a legitimate dispute by the borrower.

Second, the 6-month safe harbor goes back too far. If a borrower had a decrease in income 5 months ago, but now has regained that income, the bank should have to take the new income into account, rather than rely upon an event that happened months ago and is no longer relevant.

A third problem with this rule is that it does not take into account the nature of the derogatory credit item, other than to prohibit creditors from relying solely on late payments of 30 days or less. A more reasonable rule would provide that the bank is required to actually investigate the nature of the derogatory credit and whether it is of the type that would realistically prohibit the borrower from being able to pay the terms of the HELOC. The present and proposed rules, insofar as they do not include a provision requiring such an investigation,

does little good other than to facilitate continued mass HELOC reduction and suspension practices.

        c.      Reliance on Credit Scores or Other Single Data Points to Determine a Material Adverse Change in Financial Condition.

The proposal neither expressly permits nor prohibits reliance on credit scores alone to determine that action is justified under this provision. The Board requests comment on the appropriateness of this approach, as well as whether and why the Board should consider expressly permitting or prohibiting reliance on credit scores to meet the requirements of § 226.5b(f)(3)(vi)(B).

The Board has identified at least four reasons for why reliance solely on credit score changes alone should not constitute sound factual basis for suspending or reducing HELOCs, including:

- First, credit scores can drop for reasons unrelated to the consumer's actual failure to pay obligations

- Second, standard credit scores do not show a consumer's actual default or delinquency probability—they reflect only a consumer's likelihood of falling delinquent or defaulting relative to other consumers.

- Third is the challenge of defining how much of a decline is sufficient to satisfy the standard. Applying a single metric such as a 40 point decline to all consumers is especially problematic, because a consumer whose score declines from 800 to 760 is still much more likely to be able to pay than, for example, a consumer whose score decreases from 600 to 560.

- Fourth, any expected future debt performance associated with consumers having a given credit score (relative to consumers with different scores) can change over time based on macroeconomic conditions. For example, a consumer with a credit score of 700 in Year One may have better future debt performance than a consumer with a score of 700 in Year Three, if the macroeconomic conditions have worsened from Year One to Year Three. This is because all consumers will have lower average debt performance levels in Year Three

In addition to these reasons, it should be again recalled that the goal of most financial institutions is to reduce or suspend as many HELOCs as quickly as possible, irrespective of whether circumstances exist that adversely affect the lenders' risk or otherwise warrant such action. Taken collectively, lender behavior over the past year or so strongly indicates that a rule that does not expressly prohibit the use of credit score declines as the sole basis for suspending or reducing an account will open the door to lenders using such bases *en masse* to the detriment of many HELOC borrowers.

It is important to recall that a decline in credit score is generally caused by a failure to make payments or other conduct that, standing apart from the credit score itself, would serve as evidence of an impaired ability to repay debt obligations. Hence, rather than rely on a credit score decline as a proxy, lenders should be required to perform an adequate investigation into the cause of the decline so that the institution will have a sound factual basis for concluding the information that caused the credit score decline constitutes a material change in financial circumstances.

## B.       The Process and Contents of HELOC Reduction and Suspension Notices

### 1.       *The Pitfalls of After-the-Fact Notice*

The present scheme allows a lender to effectuate a HELOC suspension or reduction prior to notifying the affected customer, so long as the notice is sent in the mail within 3 days after the suspension or reduction. As a result, borrowers who have used their HELOCs or who have made payments on their balances find their checks dishonored, or their payments disappear. The Board should consider, given the unfair consequences borne from an after-the-fact notice scheme, whether lenders should have an obligation to assist such borrowers as described below.

#### a.       Substantial "Parking" of Funds Prior to Account Reduction and Suspension.

Relying on their HELOCs availability, borrowers often make significant payments into their HELOCs, in essence safely "parking" monies for later use. One elderly woman in Arizona paid over $50,000 against her HELOC balance looking to store the money temporarily. Chase placed a hold on her account while the deposit cleared. At the end of the hold period, Chase informed the borrower that while the hold was placed on the deposit, her account had been reviewed and, due to a significant decline in home value, her credit limit had been reduced by $50,000 – effectively depriving her of the use of the $50,000 she had just paid in to her account.

We heard a similar story from a doctor and his wife who had been steadily using their life savings to pay down their HELOC, on the assumption the money would be available for later use. Following the suspension, the couple discovered they had no access to their savings.

In every case, the borrowers would not have made the significant pay downs had they known a suspension or reduction was imminent or possible. Each borrower would prefer to have access to the substantial payments, with the obligation to repay those sums consistent with the terms of the HELOC contract. For example, the elderly woman in Arizona would rather have the $50,000 and the obligation to repay those monies back at the agreed-upon rate in the HELOC contract than not have any access to those funds whatsoever.

**Recommendation:** The Board should strongly consider issuing guidance requiring financial institutions to return significant payments – those in excess of $5,000 – made within 30 days preceding the HELOC reduction or suspension. That would allow customers who have made significant payments with the understanding that access to those funds would be continuous to regain lost liquidity.

b.     Purchases Before Notice is Received

As may be expected from the sanctioning of after-the-fact notices, borrowers often incur dishonored check fees and other fees on checks written after the HELOC has been reduced or suspended but before notice has been received.

**Recommendation:** Out of basic fairness, the Board should consider requiring banks to either honor such drafts or to refrain from imposing those fees on drafts it dishonors, or pay the borrower to compensate for any fees assessed by the recipient of the dishonored draft.

c.     Issuance of Certified Checks

We have heard from borrowers who obtained certified checks against their HELOCs, only to have those drafts dishonored due to an as-yet unannounced HELOC reduction or account suspension. This is most often the result of a bank's internal department responsible for HELOC reduction and suspension practices failing to communicate the decision to the other branches of the same bank. The result is that the bank wrongfully issues the check as having been "certified" when in reality the bank will not honor the draft.

In one situation in which we are aware, a Wells Fargo customer went into a Wells Fargo branch specifically to have a cashier's check drawn on his HELOC account for the purpose of purchasing an automobile. The bank confirmed that he had the funds available on his HELOC line and issued the cashier's check that he then used to purchase the automobile. Days later, the bank contacted him, stating that they had made a mistake and did not realize that his HELOC had been suspended (due to a purported, yet nonexistent, "significant decline" in value). Apparently, the suspension of the account had not been properly entered into the bank's computer. Nonetheless, the bank required the customer to pay back the amount of the cashier's check even though he would never have purchased the automobile if the bank had simply advised him in advance of the HELOC suspension. The customer did not have the cash available to pay back the money to Wells Fargo, and the bank refused to allow him to have the balance added to his HELOC line. The bank garnished his checking account without advance notice and then required him to pay the remaining balance using his Wells Fargo credit card that, of course, had a significantly higher interest rate than the HELOC.

**Recommendation:** The Regulations should provide that for those banks that do not prohibit the issuance of certified checks under their HELOC agreements, once certified, a draft should be honored as if it were in fact certified.

### 2.     *Present Notices are Devoid of Critical Information*

At present, the regulations require HELOC account suspension and reduction notices to provide the "specific reason" for the suspension or reduction. In practice, this means that borrowers receive notices that regurgitate the plain reason, ie. language to the effect of "The value of the home securing the property has significantly declined in value" or "Your financial circumstances no longer support the credit limit." Without any further explanation these notices

15

are worthless and give borrowers nothing in the way of information needed to make an informed decision as to any appeal.

**Recommendation:** Initial reduction or suspension notices must contain the basic facts upon which the creditor reached its conclusion. For significant decline in home value cases, the notices should provide, along with a statement regarding the borrower's right to seek reinstatement, what the bank has on file for the following values: (1) the initial appraised value (at the time the account was opened or last increased), (2) the original credit limit and new credit limit, (3) the purported new value of the property and the method used to calculate that value (ie., AVM, TAV or BPO), (4) the initial first mortgage balance, and (5) the most recent first mortgage balance, and (6) the value required for reinstatement.

These values, which the banks should have, or at least could have, readily available, would allow borrowers to both understand the reasons for the suspension or reduction, and to calculate whether a significant decline has in fact occurred due to a reduction in the available equity cushion (or due to a decline in overall home value, in "high CLTV" situations). Critically, with these values in hand, borrowers would be better equipped to decide whether an appeal of the bank's decision is worth the time and expense. This will have the likely effect of reducing the number of appeals as borrowers will better understand the process used to achieve the value and the likelihood of prevailing via an appraisal.

Similarly, for cases where the creditor reduces or suspends HELOCs based on supposed material adverse changes in financial circumstances, the notice should specify the adverse change and provide a brief description for why the change is material or would otherwise not allow the borrower to meet the repayment obligations of his or her account.

Ultimately, borrowers should have the information the banks have. Without requiring the banks provide such information, borrowers will continue to be at a severe disadvantage in any appeals process.

## C.    Seeking Reinstatement

### 1.    *Burden of seeking reinstatement vs. Ongoing Monitoring*

Presently, the regulations and commentary permit lenders to either continuously monitor credit lines or to shift the burden of requesting reinstatement onto the borrowers. The Board has sought comment on whether the burden of monitoring should remain at all times with the creditor.

**Recommendation:** Creditors should not have to continually monitor lines at all times, as doing so removes the borrower from the decision-making process and leads to decreased transparency and oversight. Rather, borrowers should have the right to request reinstatement, and, as described in Section xx, the appeal should involve (in declining home value cases) an actual appraisal, which the borrower will only have to pay for if the appraised value comes back lower than that value required for reinstatement (which, as described in **Section xx**, lenders should be required to provide). Keeping the burden of monitoring with the banks allows the

16

banks to set their own pace on how often the account is reevaluated and the processes used to determine whether the condition that initially triggered the suspension or reduction continues in place.

### 2. Conducting the Investigation

With respect to the performance of an actual investigation for the purposes of an appeal, the proposed comment 5b(g)(2)(ii)-1 indicates that the "investigation should involve verifying that the information on which the creditor relied to take action in fact pertained to the specific property securing the affected line (as with a property valuation) or the specific consumer (as with a credit report)."

**Recommendation:** As an initial matter, such a requirement should be so basic and fundamental that it should not be necessary to expressly include it in the commentary—of course the bank should verify that it reviewed the correct property or the correct borrower's financial documents. Simply making sure the bank took action against the right account and is reviewing the correct account, however, is woefully inadequate to actually determine whether the bank acted properly in reducing or suspending a particular HELOC. For home value cases, banks should be required to calculate the initial available equity and compare it with the present equity cushion.

Then, as described below, an appraiser should review the property to determine whether the equity cushion has in fact significantly decreased. For income cases, the bank should actually review the borrower's assets and liabilities and compare them to the borrower's financial health at account origination to determine first if a change in financial circumstances had in fact occurred. The bank should then review the borrower's payment history and other factors to determine whether any identifiable adverse change will actually impact the borrower's ability to meet the terms of the HELOC agreement.

### 3. Free first Challenge for Significant Decline in Home Value Cases– A Wolf in Sheep's Clothing

Facially, the proposed change that provides a free first challenge is consumer friendly. In present practice, the price tag to appeal is generally $350, representing the cost of an appraisal, payable upfront. Removing this initial cost would result in a reduction in the number of legitimate appeals that never get filed.

Again, in what is classified as a "technical" change, however, the proposed regulation changes "appraisal" to "property valuation" in both origination and the appeals process. Hence, if an AVM was performed to suspend or reduce the account, a lender need only re-run the AVM or other valuation method when a customer appeals.

**Recommendation:** The proposed change to require financial institutions to cover the first appeal is woefully deficient, as it does away with the framework that requires an actual appraisal in the appeals process.

This change should not be approved in its proposed form. Under the present scheme, lenders generally use AVMs to initially reduce or suspend accounts. Appraisals are used in appeals to check the accuracy of the AVM value. This scheme not only honors the Congress's preference for actual on-sight appraisals, it acknowledges that an appraisal – one that accounts for variables such as home improvements and excludes short sales and foreclosures – is both more accurate and, ultimately, fairer to aggrieved HELOC borrowers.

The proposed change would allow the banks to forego ever ordering actual appraisals and instead simply re-run the AVM program to determine whether the property value had increased. This is insufficient to protect consumers, and even discourages the making of significant home improvements or other investments that are not considered in AVMs. Hence, the "improvement" to a free first appeal is illusory, as the appeal itself – being a simple re-run of a perhaps faulty AVM – no longer has any teeth.

The regulations should continue to honor the present scheme's acknowledgment that an actual on-sight appraisal (from a licensed appraisal service that is independent of the creditor) is superior to a computer model potentially created hundreds of miles away. To do so, the new changes should also require an appraisal, and the banks should pick up the cost for the first appraisal (which they can get at severely discounted rates through bulk ordering).

As an alternative, to make the process fairer and to keep costs to the bank minimal, the required suspension and reduction notices should be revised. The new notices should inform the borrowers of their right to appeal and provide details such as the new property value along with the first mortgage balance and the initial appraisal value on record with the bank and, critically, the value needed for reinstatement. The new notices should further inform borrowers that they may appeal by ordering an appraisal (from a list of no fewer than 6 lender-approved appraisal services), but that if the appraisal value that comes back is lower than the stated value needed for reinstatement, the borrower will have to pay for the costs of the appraisal. Conversely, if the appraisal comes back with a value that exceeds the stated value needed for reinstatement, the HELOC suspension or reduction should be lifted and the bank should be required to cover the appraiser's fees.

### 4. *Providing Documentation*

Proposed § 226.5b(g)(2) would require a creditor, upon the consumer's request, to provide to the consumer a copy of the documentation supporting the property value on which the creditor relied to freeze or reduce a line, or to continue an existing line freeze or reduction, based on a significant decline in the property value under § 226.5b(f)(vi)(A). Proposed comment 5b(g)(2)-1 would explain that the appropriate documentation under this provision would include a copy of a report for the valuation method used, such as an appraisal report, or any written evidence of another valuation method used (such as an AVM, TAV, or BPO) that clearly and conspicuously shows the property value specific to the subject property and factors considered to obtain the value.

Providing documentation explaining the basis for the suspension or reduction is critical and the Board should be commended for seeking comment on this important issue. The simple

18

response is that banks should unquestionably be required to provide all documentation supporting their HELOC reductions and suspensions. This information should be provided both along with the original notice of the bank's action, as well as upon a borrower's request through customer service. If such documentation is not provided with the original notice, the notice should apprise customers of the ability to request such documentation.

**Recommendation:** The proposed rule change in its present form, which requires lenders to merely provide a copy of the valuation method used (in practice meaning an AVM report) could potentially give the borrower nothing more than a piece of paper with a number on it. For example, in one case involving Wells Fargo, the customer asked for the property valuation and was provided a sheet of paper indicating than an AVM was used, the date it was used (which was nearly 6 months before the suspension), and the supposed new property value. If borrowers are to truly have a meaningful opportunity to appeal, they should be informed as to variables needed to compute actual changes in equity.

Hence, for significant decline in home value cases, the documentation should include a fact sheet that shows the claimed new property value, the original appraisal value, the bank's present understanding of the first mortgage balance, and the value needed for reinstatement. These papers would allow the customer to better understand why the credit limit has been frozen or reduced and whether the bank has accurately demonstrated a significant decline in value. At the very least, the borrower should be supplied with the information required of property valuations set forth in the Office of the Comptroller of the Currency, Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, Office of Thrift Supervision, "Interagency Appraisal and Evaluation Guidelines," SR Letter 94–55 (Oct. 28, 1994), including that the valuation:

- Be written;
- Include the preparer's name, address, and signature, and the effective date of the evaluation;
- Describe the real estate collateral, its condition, its current and projected use;
- Describe the source(s) of information used in the analysis;
- Describe the analysis and supporting information, and;
- Provide an estimate of the real estate's market value, with any limiting conditions.

Likewise, for material change in financial circumstances cases, the financial institutions should provide a fact sheet specifying the actual adverse change in financial circumstances (ie., Your income has dropped 10% or You have multiple delinquent accounts) and a brief explanation for why the bank considers the change to be material.

5. *30 Day Rule for Investigations*

The Board has proposed a rule that would require lenders to complete their investigations within 30 days. So long as a meaningful investigation is required, consumers stand to benefit for such a rule.

**Recommendation:** Accept as proposed. 30 days is more than ample time for a bank to determine whether the conditions that initially triggered the suspension or reduction continue, even if it requires getting a new appraisal.

D.   **Special Issues**

1. *HELOC account Reductions: Proportionality*

The Board has requested comment on the following:

Whether other limitations on the amount by which a home-equity line may be reduced may be appropriate. For example, should the amount by which a credit line may be reduced for a significant decline in property value under §226.5b(f)(3)(vi)(A) be limited to (1) No more than the dollar amount of the property value decline; (2) No more than the amount needed to restore the creditor's equity cushion at origination (and whether, in this case, the relevant equity cushion should be the dollar amount or the percentage of the home value not encumbered in debt); or (3) Some other measure? A related request for comment is whether a creditor should be prohibited from temporarily suspending advances on the line until, for example, the property value declines by the full amount of the credit line.

It is fundamentally unfair for a credit line suspension to be grossly disproportionate to the amount of the purported decline in property value. Banks currently operate by suspending HELOCs at a customer's then-outstanding balance. On a $100,000 line with a $35,000 balance, a bank can suspend the line at $35,000 based on *any* size decline in property value, so long as it is "significant." The customer who has a $0 balance on a $100,000 line can also have his limit suspended at $0 (and, thus, effectively eliminated entirely) based on the same decline in value. That is unfair to the customer who has zero balance, including the customer who responsibly uses the HELOC and then pays it down quickly.

The current policy is also disproportionately unfair to individuals with higher lines of credit. For example, a customer with a $40,000 balance on a $50,000 line of credit will have his account frozen at $40,000, thus freezing $10,000, or 20% of the original line. A customer with a $40,000 balance on a $1 million line of credit might also have his account frozen at $40,000, thus freezing $960,000, or 96% of the original line. Although it is unfair to make the percentage decline in property value tied to the actual dollar decline in available credit, as that would disproportionately impact individuals with smaller credit lines, there should be some correlation between the decline in property value -- which can be calculated both in actual dollars and in

percentage decline – and the amount or percentage of the HELOC line that is suspended from use.

The one-size-fits-all method currently utilized by creditors thus has a punitive result:  the HELOC is suspended at its current balance regardless of the amount of decline in property value and regardless of the fact that a decline in property value is not the "fault" of the consumer. Unlike a HELOC suspension caused by a consumer's failure to pay, the banks' effective elimination of credit lines based on significant declines in value should be based on the actual increased risk to banks posed from the property value decline, keeping in mind already that the present equity cushion approach keeps the banks, at all times, fully able to foreclose and recover 100% of any outlays.

**Recommendation:**  It is not practical for a bank to suspend or reduce credit lines based on the speculative credit limit they would have permitted based on the new value of the property. That is unfair to the consumers and unmanageable for the banks.  But a reasonable method is to make the suspension or reduction proportionate to the purported decline in value up to, but not below, the outstanding balance.  Hence, a percentage drop in home value of 10%, where significant, should result in a correlative reduction in the available credit limit of 10%.

### 2.    *Continuing Suspensions or Reduction For Other Reasons – Unfair Notices*

Another serious issue is the practice of requiring the submission of financial information as part of the appeals process in a "significant decline in home value" case.  GMAC, for example, requires that for all of its borrowers whose accounts it suspends or reduces based on drops in home values, the borrowers must submit current financial information within 15 days. Nothing in the notice suggests the suspension or reduction is attributable to a change in financial circumstances in any way.  Likewise, the Notice never explains what the consequences are of failing to provide the information within 15 days.

Wells Fargo requires that any customer who appeals a home value determination must first submit current financial information prior to Wells Fargo even permitting the customer to obtain an appraisal.

Although a bank has the right to request financial information, submitting such information should not be a prerequisite for the bank performing an investigation into a suspension or reduction that was originally premised on a supposed decline in home value.

These practices allow banks to skirt the requirement that they first act with a sound factual basis when reducing or suspending a HELOC.  These practices also unfairly discourage challenges of the bank's initial determinations in those cases where the bank failed to act with sound factual basis in computing the home value at the outset.  Also, failing to indicate in the notices what the consequences are of failing to submit the requested papers (suspension, being precluded from appealing, etc.) further places borrowers at a decided disadvantage.

**Recommendation:**  The Board should reconsider the language used in the regulations indicating that a bank must reinstate the line assuming no other conditions permitting suspension

21

exist. Presently worded, ambiguity exists as to whether a bank can require financial information to hold up the appeals process for reduced home value cases or vice-versa. Furthermore, without clarifying the rules, lenders who do have a sound factual basis may succeed keeping the suspension or reduction in effect anyways on grounds they did not initially possess.

### 3.    Lender Claims That Regulation Z Does Not Apply to Borrowers Who Use their HELOCs for Any Business Expenses.

Advocating a position that hurts small business owners who use their HELOCs from time to time to help with miscellaneous business expenses, lenders often defend their HELOC reduction and suspension practices by claiming the borrower used the HELOC, from time-to-time, for business purposes. This results in a situation where lenders justify account suspension with TILA but then say that TILA does not apply when the customer challenges the bank's compliance with the law. Whether the courts will, through estoppel or other legal arguments, prohibit a creditor's use of TILA as both sword and shield remains to be seen.

**Recommendation:** The Board should consider clarifying that all HELOCs are covered by TILA, and that a lender cannot avoid liability under TILA or Regulation Z by pointing to an occasional business use. A contrary position hampers small business owners who use their HELOCs occasionally to pay for miscellaneous business expenses and allows lenders to escape liability under TILA despite having acted at all times as if TILA applied. Lenders who do not intend for HELOCs to be treated as having been made for personal purposes should disclose the non-consumer purpose of the loan at the time the customer applies for the HELOC.

### 4.    Lender Influence Over Appraisers

We have received reports that certain lenders, especially Chase, have reprimanded, dropped or blacklisted appraisers for returning appeal values that the bank internally decides are "too high." Chase is known to have "blacklisted" several appraisers who, despite providing accurate appraisals, provided one or two appraisals that Chase deemed too high in value for the purpose of the HELOC appeal. The message has been sent to other appraisers not to value properties for the purposes of determining HELOC appeals accurately, but rather to submit the lowest price feasible. Additionally, Morgan Stanley is allegedly reported to have instructed one of its appraisers to lower the value of the appraisal to an amount lower than the stated value needed for reinstatement so as to prohibit reinstatement.

**Recommendation:** The Board should strongly consider implement a rule that requires creditors to allow borrowers to use a recent appraisal (within 60 days) from any licensed appraiser in the state where the property is located to appeal an AVM or other opinion. Another suggestion would be for the banks to provide borrowers with a minimum of 6 pre-approved appraisal services from which the borrowers could choose. The rule should expressly prohibit the lender or borrower from exercising any control or influence over the substance of the appraisal process and should include a disincentive for lenders who exert undue influence. Such a rule should also allow borrowers who suspect creditor interference to present a valuation from an independent, licensed appraiser located in the state where the property is situated to rebut the bank's appraisal.

## V.    SUMMARY OF FINDINGS

•       The Board should be cautious prior to adopting any rule that allows creditors to shortcut performing an adequate investigation into the circumstances surrounding an individual HELOC account so that the creditor may obtain a sound factual basis prior to suspending or reducing the credit limit.

•       Creditors must be required to take into consideration any changes in first mortgage balances, as that is a key variable in the equation used to determine available equity. The proposed changes are very much one-sided. For example, in determining the "significance" of any claimed decline in home value, when calculating if the amount of equity in the property has changed, the rules allow banks to take certain factors into consideration, such as first mortgage balances, when it supports the banks' decisions, but the bank can ignore such factors when it would help the borrower show the decline isn't significant. Under the proposed rules, available equity only matters if it helps the banks.

•       The Board should provide a bright line to show when a particular decline in the equity cushion is insignificant, such as a 35% decrease in extra equity, so that borrowers may demonstrate a particular decline is not significant so as to justify a suspension or reduction. Otherwise, the rules are set up so that banks know when they haven't broken the law, but not when the banks have broken the law. This strips away the ability of borrowers who haven't experienced a significant decline in home value or adverse change in finances to get their HELOCs reinstated since the banks act as if the creditor must prove the bank was wrong in order to get their credit back.

•       The present rules require the banks to use computer models that are tested and monitored regularly for their accuracy, and that the results be documented. The proposed changes would do away with these requirements and allow banks to use AVMs with certain labels and names like "hybrid" or "hedonic" irrespective of whether those models are actually accurate or tested on a reasonable basis to reduce error.

•       The Board should not eviscerate the need for an actual appraisal as part of the appeals process. Such a rule hurts both appraisers and consumers and allows banks to simply re-run the faulty AVMs used to justify the wrongful suspension initially.

•       The Board should adopt rules to account for issues that arise with respect to checks drawn following the suspension or reduction but prior to the receipt of notice, including issues regarding certified checks and substantial pay downs.

•       Under the present rules, banks seize upon single negative credit report items, even disputed items, to claim that a borrower's financial circumstances have changed. The proposed rules would make it even easier by doing nothing to stop banks from acting whenever there is a drop in credit score, no matter the cause.

•       The present rules encourage banks to withhold critical information from borrowers, such as the specific evidence the bank had for taking action. The proposed rules would do nothing to change this.

•       Also under the present rules and proposed rules, banks can lay-in-wait for a borrower to use some of the HELOC for business expenditures and then claim the borrower has no rights under Federal law since it was used for a business purpose.

## VI.    BORROWER STORIES

In addition to the stories shared throughout this response, our law firm has spoken with approximately 1000 aggrieved HELOC customers. Although we would enjoy sharing each of their stories, it is unnecessary. What follows is a representative sample of the types of issues everyday HELOC customers have encountered as a result of the banks' abuses of the present rules. Reading through them, it becomes clear that most major lenders are more interested in simply getting out of their HELOC contracts (no doubt due to the favorable interest rates they provide borrowers) than in managing their overall risk levels. Names have been omitted to protect customers from bank retribution (which occurs regularly, in various forms).

### Bank of America

**Customer Story No. 1, Winter Park, Florida:** We have heard from one customer who has been a licensed real estate appraiser or 20 years. The letter of her HELOC suspension outlined the appeals process and required her to submit one or more of the documents that would support the contention that her home value was over $169,877, such as comparable sales and web print outs. The borrower immediately submitted a detailed listing of the "ideal" comparable sales and web printouts showing that her home value was well above the required threshold. Subsequently, after not hearing anything from Bank of America, the borrower submitted additional listings and comparable sales on at least three other occasions, again showing that her home value the required threshold. Having received all the relevant documentation, Bank of America did an about-face and then required the borrower to order and pay for an appraisal done by an approved appraisal company—but refused to disclose a list of such approved appraisers despite repeated requests. The representative further stated that an appraisal from a company other than the one of the approved list would not be accepted. As of the date of this filing, the borrower is still unable to obtain information about the Bank of America's approved appraisers so that she might have the opportunity to appeal her HELOC suspension.

**Customer Story No. 2, Bethesda, Maryland:** Another customer's HELOC was originally opened at $57,000 and then subsequently increased to $250,000. The borrower then received a letter informing her of a significant reduction of her credit line. She repeatedly called Bank of America requesting the necessary information, such as her home value as appraised by Bank of America at the time of the credit limit increase, her first mortgage balance at that time, the home value necessary for reinstatement, and other important information that would reveal whether the HELOC suspension was warranted and lawful. As of the date of this filing, Bank of America has refused to respond to this borrower's repeated requests for information.

### National City

**Customer Story No. 1, Germantown, Tennessee:** National City suspended a customer's HELOC in April of 2009 claiming that his property value had declined to $332,100.

The customer immediately wrote back to National City requesting reinstatement of his credit line and explaining that, even if this home value was taken as accurate, his HELOC should not have been suspended because any possible decrease in property value was offset by the significant pay down of his first mortgage. Indeed, using National City's own valuation, which the customer believed was lower than the market value, the home value declined only by 6.4%, and the unencumbered equity declined by just 12.8%. In his letter, the customer also advised National City of his impeccable credit score of 802 or higher, stable income, and otherwise stellar financial situation. Nevertheless, National City has not responded in any way to his request for reinstatement and has not reinstated his HELOC.

**Customer Story No. 2, Decatur, Georgia:**  The HELOC suspension letter stated that this customer's new home value was estimated at $372,000, which represented just $33,000 decline from the original appraised value of $405,000. At the same time, the unencumbered equity in the home *increased* by at approximately $20,000 since he had made significant payments aimed at lowering his first mortgage since the HELOC origination in 2004. The increased available equity was far greater than the $44,000 HELOC. When the customer called National City to dispute the suspension of his HELOC, he was advised by the customer service representative that the reinstatement of his HELOC would be guaranteed only if he obtains appraisal showing that his current home value was at least $405,000—the original value or greater.

### Citibank

**Customer Story No. 1, California:**  Despite a customer's property not significantly declining in value, Citibank decided to slash the customer's HELOC by over 55%. Citibank sent a HELOC reduction notice letter to the customer, who received it 3 days later. Subsequent to the HELOC reduction, but prior to receiving the notice letter, the customer wrote two checks drawn from his HELOC. Citibank did not honor these checks, causing the payees of the checks to assess "not sufficient funds" fees against the customer. Citibank's reduced credit limit, and requirement that the customer pay hundreds of dollars for an appraisal in order to appeal the decision, forced the customer to find a replacement home equity line from another lender which resulted in the customer having to pay substantial closing costs for the new line. Additionally, when the customer used the new HELOC to pay off and terminate the Citibank HELOC, Citibank assessed a $434 early termination fee against the customer.

**Customer Story No. 2, California:**  Citibank canceled one couple's HELOC claiming their $1.7 million home had declined in value to $1,018,000. When the customers appealed, Citibank sent an appraiser to the home, charging the couple $800 in the process. The appraiser's value came in at $1,300,000. When the couple disputed the appraisal and submitted their own broker's opinion and AVM indicating the property was in fact $1.7 million, Citibank not only said the couple's AVM was incorrect, but that the error constituted fraud—despite the fact Citibank's own appraiser came back with a value over $280,000 higher than Citibank's AVM. If Citibank considers an erroneous valuation to be fraud, then Citibank itself has plainly acted fraudulently.

25

## GMAC

**Customer Story No. 1, Hayward, California**:  We know of a GMAC customer who had a HELOC with GMAC for over five years.  The letter of suspension claimed that the home value had declined, but omitted any relevant information whatsoever, such as what the new home value was, what the original home value was, whether there was any decline in an unencumbered equity in the property, and what home value was needed to have the HELOC reinstated.  The customer service representative explained to the customers that the suspension of their HELOC was caused by the general decline in property values in their area, and that they would have to get an appraisal done in order to appeal the suspension, provided however, that the reinstatement would be solely within GMAC's discretion.  The customers have ordered and paid for an appraisal that showed that their property has not declined in value so as to fall within the safe harbor, and that they still had over $327,000 in the available equity in their home, which was more than enough to support the $125,000 HELOC.  On December 15, 2009 the customers submitted their request for reinstatement, along with the appraisal report and their financial documents, as required by GMAC.  As of the date of this filing, they have not heard back from GMAC.

## Wells Fargo

**Customer Story no. 1 Westmont, Illinois:**  One customer's HELOC suspension letter dated indicated that his available credit was reduced just above the outstanding balance "due to a substantial decline in the value of the property securing" the HELOC.  Upon receipt of this letter, the cusotmer immediately contacted Wells Fargo customer service and requested an explanation of the decision.  Wells Fargo responded by stating that the bank used an automated valuation model ("AVM") that estimated the home value at $531,000.  This estimate was dated almost a full six months before the suspension.  Despite its conclusion that the customer was somehow too risky as a borrower, shortly after the reduction, the customer received an unsolicited notice informing him that his Wells Fargo Visa credit card spending limit – with its accompanying exorbitant interest rate – had been *increased* by 20% from $20,000 to $24,000.

**Customer Story no. 2 Fort Wayne Indiana:**  Another Wells Fargo customer, a small business owner, had her HELOC suspended due to a stated reason of "derogatory credit."  It turned out that the customer had 1 late charge on her credit report, which she vigorously disputed.  The customer cleared up the credit report issue and applied for reinstatement, at which time a Wells Fargo representative threatened her and said that if she tried to appeal Wells Fargo's decision, Wells Fargo would take action against her separate business accounts.  When the customer asked what choices she had, Wells Fargo informed her she should "carry cash."  This customer ahs filed suit, and Wells Fargo is claiming that, despite the fact she has never even used the line for business purposes, and the fact Wells Fargo relied on TILA in suspending her account, her status as a small business owner should require the Court to find that TILA does not afford her any protection or rights.

**Customer Story no. 3, Oak Park, California:**  Another Wells Fargo customer had his line lowered to just over his balance because of the purported decline in his home value.  The customer repeatedly contacted Wells Fargo in person and over the phone seeking an explanation.  Various Wells Fargo customer service representatives informed him that: (1) the bank was unable and unwilling to disclose the present value of the subject property; (2) the bank was unable and unwilling to disclose the original value from which the property had purportedly

significantly declined because such information was only kept for 90 days; (3) Wells Fargo had actually made its decision to reduce credit limits or suspend accounts due to new underwriting and loan-to-value ("LTV") ratio standards and that the customer's LTV was too high to support the new LTV standard; and (4) in order to seek reinstatement, the customer must first "re-qualify" by submitting his financial statements and then, if his financial information was found to be satisfactory in Wells Fargo's sole opinion, he would need to order and pay for an appraisal of his home.  At no time did Wells Fargo ever disclose what the appraised value must be in order to reinstate the HELOC.  This customer was told that Wells Fargo would advise him whether he was "re-qualified" within two to three days after submitting his financial documents.  The customer submitted the requested financial information in September 2009 and did not hear back from Wells Fargo until over a month later, after he had filed a lawsuit.

## Chase and WaMu

**Customer Story no. 1 - Cupertino California:**  Customer received a form letter from WAMU/Chase requesting the customer provide IRS Form 4506T within 14 days.  The letter was silent with respect to what would happen if such information was not provided, merely stating that supplying the information was "important."  The Customers promptly submitted information that showed their financial condition had remained stable and that they had never defaulted on the line.  In fact, they had consistently paid extra monies towards reducing the principle balance.  Without anything further, Chase suspended the HELOC before the 14 days had expired and refused to reinstate the line despite repeated calls to customer service.

**Customer Story no. 2, Seattle, Washington:**  Cusotmer received WAMU/Chase's request that he provide IRS Form 4506T within 14 days.  The letter was silent with respect to what the consequences were of not submitting the information.  Customer reviewed his HELOC agreement where it provides that the lender may require, upon request, the borrower's "current financial statement, a new credit application or both" but noticed that nowhere was he required to provide IRS Form 4506T.  Customer promptly contacted WAMU/Chase to request where he should send his financial statement or credit application, and for WAMU/Chase to indicate under what provision in his HELOC agreement Chase was asserting the right to require him to submit an IRS Form 4605T.  After he received no response, Customer learned his account had been frozen.  Customer spoke with several customer service personnel and other loan officers, was instructed to submit pay stubs, and was eventually told that WAMU/Chase would not lift the suspension until he submitted IRS Form 4506T, regardless of the language of his HELOC agreement.  In any case, Customer financial circumstances have not adversely changed, but rather improved significantly since the inception of his HELOC account due to a job promotion and concomitant raise.

**Customer Story no. 3, Carlsbad California:**  Customer was in the process of performing home repairs and had written a check from her WAMU/Chase HELOC account for approximately $9,000, well within her "available" balance.  Several days passed when the customer was notified by the window company, a small business owner, that the check had not cleared her account.  The customer repeatedly called Chase customer service, but no one could answer her question of whether Chase had any intention of honoring the check.  Instead, the customer service representatives could only say that they had sent out a request for IRS Form 4506T and that they had not received her paperwork.  The customer promptly faxed in the form.  Then, seven days after she first learned there was an issue, the customer received a form

suspension letter in the mail. She called the bank repeatedly over the next three weeks to see if the check would be honored, but no one at customer service could provide an answer. Finally, the window company operator notified her that the check had been dishonored, which forced her to secure alternative means of payment. To be sure, the customer has worked the same job for the past 23 years and enjoys a credit rating of 750.

**Customer Story no. 4, Boulder Colorado:** One customer lost his job in 2007. Fortunately, however, he not only received a generous severance package, he was also able to quickly find excellent work paying more money than he earned at his previous job. Using the severance package, the customer paid down his HELOC balance with the expectation that he could draw it back out later if needed. Several months passed when, while checking his account online, the customer discovered his account balance showed $0 available. When he contacted customer service, the customer was informed that he had not provided Form 4506T. Despite promptly forwarding the "required" form soon thereafter, the customer has heard nothing and his HELOC account remains frozen without justification.

**Customer Story no. 5, Pasadena California:** Customers received the request that they submit IRS Form 4506T and they promptly sent in their information before the 14 days had lapsed. Shortly thereafter, they received another letter indicating their HELOC account had been suspended due to an adverse change in their financial position. This was despite the fact that both women had the same jobs they had had when the line was first opened—the only difference being they made slightly *more* given annual cost of living adjustments. In fact, since the time they first obtained the HELOC, the customers had purchased (and were operating) three rental properties and a vacation home. Moreover, they had never missed a payment and had even paid down extra every month on their first mortgage. The customers promptly visited their local WAMU/Chase branch in Sierra Madre and informed their loan officer that they had a home value of $950,000 with only $280,000 in encumbrances along with a clear credit report. When they asked if anything could be done, the loan officer answered, "This is happening to many people, perhaps you should try Bank of America or Wells Fargo." The customers soon thereafter paid off the remaining balance and closed the line, thereby incurring termination fees and other charges. The pair suspects the bank's decision was due at least in part to the fact the interest rate was only 3.25%.

**Customer Story no. 6, Malibu California:** Customer responded to the bank's request for Form 4506T within the 14 days provided in the letter by faxing in her information. Several days passed when she received a letter notifying her that her $500,000 credit line had been suspended due to the fact the bank had not received her form. Surprised both by the fact the initial letter never disclosed that her line could be suspended and by the bank's failure to call her and ask for the materials, the customer then went to her local branch and faxed the paperwork from there. The customer included several months of financial statements for her business (of which she owns 100%) as well as documents relating to a rental property she owns, together which showed she earned approximately $500,000 per year. Despite repeated calls to the bank, The customer heard nothing until she received a letter that stated her line had been permanently suspended based on information obtained from TransUnion, a credit-reporting agency. The customer then contacted TransUnion, which informed her that a derogatory item existed from Union Bank. The Customer then contacted Union Bank, explained that the derogatory item was

an error, and asked Union Bank to remove the item (which Union Bank did).  The customer then contacted WAMU/Chase and indicated that the lone derogatory item on her credit report from Union Bank was an error that had been resolved.  The customer forwarded additional information demonstrating the health of her business and reminding WAMU/Chase that she had always made her payments on time (they were set up to be automatically deducted from one of her other bank accounts) and that her credit score was 771 (up from 756 with the removal of the union Bank item).  Apparently ignoring this information, WAMU/Chase has refused to re-instate the customer's credit line.

   **Customer Story no. 7, Escondido California:**  Customer was told her line was frozen when an AVM had established her home was worth $730,000.  The Customer knew this value was unreasonably low given the improvements she had made to the property.  It was no surprise, therefore, when the LSI appraiser who actually visited her property valued the home at approximately $1.15 million.  Only after lawyers intervened and contacted Chase repeatedly did Chase agree to reinstate the credit line and honor a check she had cashed prior to receiving notice of her account suspension.  The customer was never reimbursed for the appraisal.

   **Customer Story no. 8, CA:**  WAMU/Chase froze this customer's HELOC by claiming his home value had dropped from approximately $1.5 million to around $700,000.  His first mortgage balance is approximately $370,000 and the credit limit from his HELOC was $183,000.  Even at its lowest point, the market value of the house never dipped below $1.3 million.  When the customer contacted customer service, he was told that Chase had used a value estimator whose formula was based on property tax assessments.  This is seriously problematic for a subclass of citizens of California given Proposition 13, the State's rule that limits any county from raising values for tax purposes by more than 1% per year.  The customer has owned his home for 20 years, making tax values a particularly egregious valuation metric.  When he contacted customer service, WaMu/Chase said the bank had lowered the HELOC, and supervisors at WaMu said there is nothing they can do since Chase controls the process.

   **Customer Story no. 9, Phoenix Arizona:**  Customer was informed by Chase that his home was worth only $811,000.  Customer's records indicated this would mean a decrease from the $900,000 original value of the home, despite the fact he had made significant home improvements since the time he first obtained his HELOC.  The LSI appraisal revealed that, far from a decrease, Customer's home was actually worth $970,000—no doubt a result of the significant improvements he had made.  Customer submitted the appraisal to Chase on June 16, 2009.  Hearing no response for over a month, he filed his lawsuit July 17, 2009, and a copy was sent to Chase's counsel on July 20th.  On July 23, 2009 – a week after the lawsuit had been filed – Chase notified customer that his line had been reinstated.

   **Customer Story no. 10, Long Beach CA:**  Customer used his HELOC in part to help finance the reconstruction and rehabilitation of three structures – a historical house, a rental house, and a garage – situated on a historical property in Long Beach.  The property, which was substantially deteriorated when he obtained the credit line in June 2008, was appraised at $775,000 for the purposes of the plan.  During the next twelve months, Customer invested more than $168,000 in the property by making substantial repairs to the structures, including but not limited to:  repairing the deteriorated, historic wood siding, repainting the two residential

structures, performing structural work and cosmetic work for a rebuild of the garage which was nearing collapse, repairing or rebuilding approximately 80 wood windows to match the original condition, finishing the reroofing of the main house and garage, replacing deteriorated porch support columns, adding central air to the rental house, and replacing its heating system, and performing demolition work needed to add parking spaces at rear of the lot. Chase has required customer to pay $550 upfront for an appraisal, despite the fact that other customers have been charged far less for such a valuation, raising the potential issue of Chase overcharging on appraisal fees.

**Customer Story no. 11, Roseville CA:** Customer was notified her low-interest HELOC was being suspended due to a decrease in the value of the property. Mere days following the notification, Chase sent customer an offer for a credit card carrying a 15% APR.

**Customer Story no. 12, San Diego, CA:** In 2008, Chase reduced Customer's credit line from $140,000 to $40,000 following a supposed decline in the value of his property. At the same time Chase was slashing his secured credit line, they were repeatedly sending him balance transfer offers on his Chase credit cards, allowing him borrow unsecured funds.

## VII.   CONCLUSION

Ultimately, financial institutions have gone far beyond merely protecting themselves and have instead frozen or reduced accounts where no significant decline in home value or material adverse change in financial condition has first occurred. Put simply, the banks have frozen or reduced accounts for hundreds (and potentially thousands) of customers where the suspension or reduction never should have happened. In the process, lenders have improperly choked off HELOC borrowers from affordable, bargained-for credit in a manner inconsistent with the TARP mandate and overall damaging to the national economy. These borrowers do not seek a windfall—they merely want the benefit of their HELOC contracts and to be treated fairly. While protecting banks is surely important, access to affordable credit for consumers and small businesses who do not present a risk to banks is also important in this difficult economic climate.

# EXHIBIT Y

P.O. Box 17198
Wilmington, DE 19850-7198

# Write a check now. Pay it off later.

Mr. Jeffrey D. Schulken
10415 Calvert Dr.
Cupertino, CA 95014-3835

Dear Mr. Jeffrey D. Schulken,

Wouldn't it be nice if you could write a check now and pay it off later — just like a credit card? Because of the good credit on your Amazon.com account ending in 0287, now you can. We've attached checks you can write up to the unused portion of your available credit.

Use check numbers 5685 and 5686 to get a low promotional 0% APR until your 06/2010 statement opening date.[†]

Or use check numbers 5687 and 5688 to get a low promotional 2.99% APR until your 12/2010 statement opening date.[†]

At the end of the promotional period, your APR will be 13.24%. This rate will vary with the market based on the Prime Rate. This offer includes a fee of 3% of the amount of each transaction. This transaction fee has a $5 minimum and no maximum.

You can use these checks to transfer balances from other high interest rate cards. Just make sure you have enough available credit for the transaction(s), interest, and any related fees.

Now, whatever great opportunities come your way, you'll have the funds to take advantage.

Sincerely,

Deb Walden
Executive Vice President, Customer Experience
Chase Card Services

P.S. Hurry, your checks must post to your account by 10/31/2009 to get these low promotional rates. For your convenience you can take advantage of this offer by using the enclosed checks, visiting www.chase.com/balancetransfer, or calling the telephone number located on the back of your credit card.

| USE THESE CHECKS TO | Make home renovations<br>Cover educational expenses<br>Purchase home furnishings<br>Plan a weekend away<br>Transfer high rate balances<br>Take care of unexpected expenses |
|---|---|

## Here's how it works:

### Choose the low APR that's right for you.

**0%** APR
until your 06/2010 statement opening date.[†]

**2.99%** APR
until your 12/2010 statement opening date.[†]

### Write the check(s) against your credit line

or **$25,000.**

Transactions must post to your account by 10/31/2009.

A fee of 3% (minimum $5, no maximum) applies to the amount of each transaction from this offer.

### How your actions can affect your account:

To keep your low promotional APR please make sure you don't:
▾ Pay late
▸ Go over limit
▪ Have a returned payment

### Good to Know:

**When calling to transfer a balance:** In order to protect your privacy and expedite balance transfers made over the phone, we ask that you call from the telephone number associated with your account. Have your account number handy, and be prepared to give us your full name, address, and amount for each transfer.

[†] IMPORTANT INFORMATION: The use of the attached check or draft will constitute a charge against your credit account. A fee of 3% (minimum $5, no maximum) applies to the amount of each transaction from this offer. Any APR for this offer is subject to the payment allocation and default terms described on the reverse side. If any balance from this offer remains after its limited duration APR expires, it will then be subject to the standard or default APR applicable to such balances as determined by your Cardmember Agreement. Transactions from this offer that post after the void date disclosed or that are made payable to Chase, Bank One or First USA or one of our related banks or companies will be declined. In these disclosures, "we," "our," or "us" means Chase Bank USA, National Association.
(Continued on reverse side)

Amazon, Amazon.com and the Amazon.com logo are registered trademarks of Amazon.com, Inc. or its affiliates.

009-044-067-09/09-19637331

# EXHIBIT Z

**HRLM Database Screen-Print; Request 3/13/09**



**HRLM Database Screen-Print; 1st Appeal/Review**



**HRLM Database Screen Print; 2ⁿᵈ Appeal/Review**



**HRLM Database Screen Print 3ʳᵈ Appeal/Review**



# EXHIBIT AA

**Washington Mutual**

**DISBURSEMENT INSTRUCTIONS AND INSTALLMENT LOAN AMOUNT
FINANCED ITEMIZATION TRUTH-IN-LENDING DISCLOSURE**

Redacted

| BORROWER(S) | LOAN NUMBER |
|---|---|
| JEFFREY D. SCHULKEN | 9764 |
| JENIFER I. SCHULKEN | DATE 10/17/2005 |

| | CREDIT* | DEBIT** |
|---|---|---|
| **1. AMOUNT FINANCE CALCULATION:** | | |
| Loan Amount | $250,000.00 | |
| a) Prepaid fee(s) paid by Borrower | | |
| Federal Express Fee          to Washington Mutual Bank | | $9.00 |

| | | |
|---|---|---|
| **TOTAL ITEMIZATION OF THE AMOUNT FINANCED** | | $249,991.00 |

**2. DEPOSIT(S) - FUNDS RECEIVED:**
Borrower
Seller

**3. AMOUNT GIVEN TO YOU DIRECTLY:**
Funds to Borrower (Checking/Savings/Wire)
Check to Borrower

**4. AMOUNTS PAID ON YOUR ACCOUNT WITH LENDER:**

| | | |
|---|---|---|
| **5. AMOUNT PAID TO OTHERS ON YOUR BEHALF:** | | |
| Seller Lien Payoff Amount | | |
| Creditor Payoff          to STATE FARM BANK | | $124,861.48 |

| **6. LENDER PAID FEES AND CHARGES:** | | |
|---|---|---|
| Flood Determination Fee          to PLU, LLP | $5.00 | $5.00 |
| Avm Fee          to Trans Union | $5.00 | $5.00 |
| Property Verification Report          to Group 9, Inc. | $18.00 | $18.00 |
| Second Mortgage Protection          to Great American Assurance | $30.00 | $30.00 |
| Recording Services/ Recording Fee          to Group 9, Inc. | $50.00 | $50.00 |

**7. SELLER PAID FEES AND CHARGES:**

| | | |
|---|---|---|
| **8. FUNDS REMAINING TO DISBURSE:** | | $125,129.52 |
| **TOTALS** | $250,108.00 | $250,108.00 |

\* Represents funds received or credited toward the initial loan amount requested.
\*\* Represents funds paid out or debits against the initial loan amount requested.

I/We authorize disbursement of the above loan funds as itemized.  I/We request that any excess funds be paid to me upon receipt of all final loan documents.

_____
JEFFREY D. SCHULKEN

_____
JENIFER I. SCHULKEN

30885 (07/15/05) W6.3          **BANK**          Page 1

CHASE 00045